UNITED STATES of America,
Plaintiff-Appellee,

v.

Leslie FLEISHMAN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Peter COMBS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Stephen GREEN, Defendant-Appellant.

Nos. 80–1410, 80–1414 and 80–1451.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1981.

Decided Aug. 26, 1982.

Rehearing and Rehearing En Banc
Denied Oct. 15, 1982.

Certiorari Denied Nov. 29, 1982.
See 103 S.Ct. 464.

Jaun P. Robertson, Los Angeles, Cal., for Green.

Brien Q. Robbins, Deputy Federal Public Defender, Los Angeles, Cal., for Fleishman.

Howard L. Weitzman, Weitzman & Fidler, Los Angeles, Cal., for Combs.

Frederick M. Flam, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before KENNEDY and ANDERSON, Circuit Judges, and MURPHY, Senior District Judge.[*]

J. BLAINE ANDERSON, Circuit Judge:

Fleishman was convicted of possession with intent to distribute, and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), and of conspiracy to commit the same in violation of 21 U.S.C. § 846. Combs and Green were convicted as coconspirators, and for having aided and abetted the possession with intent to distribute, and distribution of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 18 U.S.C. § 2(a). Appellants were sentenced to six years' imprisonment on each of the three counts set forth above, the sentences to run concurrently and with eligibility for parole as provided by 18 U.S.C. § 4205(b)(2). The appellants were further ordered to serve three-year minimum special parole terms on the counts not involving conspiracy. We affirm the convictions on all counts.

Appellants have raised numerous issues on this appeal which we discuss below.

FACTS

In February, 1980, George Kelly, a paid informant, introduced Fleishman to Drug Enforcement Administration (DEA) agent Needham. At this meeting, Fleishman told the agent that he had ten pounds of cocaine for sale. When asked whether he was in control of the substance, Fleishman indicated that he had partners. He stated that

[*] The Honorable Thomas F. Murphy, Senior United States District Judge, Southern District of New York, sitting by designation.

his partners would bring him a sample of the cocaine from the San Fernando Valley where "his people" were in possession of it. Fleishman also expressed the wishes of his purported partners concerning other details of the transaction.

On February 13, 1980, Fleishman provided a sample of the cocaine to Needham for a chemical analysis. At this time, Fleishman told the agent that "his people" wanted him to count the money prior to the delivery of any cocaine. He said that his people had moved the cocaine to an area near the Los Angeles International Airport and rejected Needham's request that it be brought to the Oceanside area.

Fleishman indicated that his people would get a hotel near the airport and suggested that Needham do likewise. Following the chemical analysis, Fleishman agreed to deliver ten pounds of cocaine in Los Angeles that afternoon. Needham asked for additional time to amass the money, but Fleishman said that he wanted to conclude the transaction that evening because the ten pounds would be the end of a large load.

Several conversations ensued between Needham and Fleishman, and it was finally determined that Fleishman would be at the Hyatt Hotel near the airport. When Needham arrived at Los Angeles, he called Fleishman and was informed that the cocaine had arrived and that "everything was okay." R.T. at 155.

Fleishman then met Needham at the Pacifica Hotel where Needham was registered. Fleishman indicated that after he counted the money, he would contact his people to report the same and then the transaction could continue. After counting the $105,000, the agreed upon price for the first three pounds, Fleishman made a telephone call and told the agents that his people were in the lobby of the Pacifica Hotel. He made a second call and asked that "Joseph Cotton" be paged. Thereupon, Fleishman left the room for approximately twenty minutes.

He was observed during that time by another DEA agent in the Pacifica lobby where he was met by Green. The two men apparently engaged in a brief conversation and then joined Combs for five to ten seconds. The agent had observed Combs in the lobby and concluded that he was a "lookout" engaged in countersurveillance activity. Fleishman then started toward the elevator, and Green and Combs went to the registration desk where Green inquired if there were any messages for "Stephen Cotton."

Upon returning to Needham's room, Fleishman admitted that he was merely an intermediary and indicated that his people were "a little leery," R.T. at 160, and wished to supply only slightly more than a pound in the first transfer. Needham demanded that Fleishman again contact his people and direct them to deliver the three pounds as initially agreed. Fleishman departed and returned approximately fifteen minutes later.

During that time, Fleishman was observed by another agent. Fleishman had driven to the Ramada Inn and proceeded toward the elevators. The agent approached that area and observed the indicator lights on the two elevators in operation. Both of the elevators apparently stopped momentarily on the tenth floor. Approximately five minutes later, Fleishman returned to his car and drove back to the Pacifica.

Upon his return to Needham's room, he declared that his people would only supply 480 grams on the first transaction and the remainder of the ten pounds would follow, provided the first transaction went smoothly. Fleishman told the agents that his people were at the Ramada, and agreed to again contact them.

Fleishman was observed returning to the Ramada where he parked his car in the rear parking lot and entered the hotel, and then returned to the car. He did not carry a briefcase, either from the car or to it. When Fleishman returned to the car, he turned on the interior light for 10 to 15 seconds and appeared to open and close a briefcase in the front seat.

Fleishman returned to Needham's room with a briefcase containing the 480 grams

of cocaine and was then arrested. The agents then proceeded to the Ramada where they enlisted the aid of the hotel manager, Lee Holcomb. The agent who had observed Combs and Green at the Pacifica described the two men and asked for registration cards for persons that may fit their descriptions and who lived in the San Fernando Valley or the San Diego area. Holcomb produced cards for rooms 1021 and 1022 which were registered in the name of "Stephen Price." (Green's name is Stephen Price Green).

The agents and Holcomb went to room 1021 and Holcomb knocked and announced his identity, and requested that the occupant open the door. When Combs opened the door, Agent Clayton announced his identity and informed Combs that they were conducting a narcotics investigation. Combs allegedly invited the agents in and stated that his name was Peter Everett. He said that the room belonged to his "business associate," Stephen Price, and that he was waiting for Price to return. Combs allegedly consented to a search of the room, which resulted in the discovery of a piece of paper with a series of numerals inscribed on it. These numerals were later linked to the cocaine negotiations over price and quantity. Combs denied having made the writing and stated that he had observed Price writing something at the table where the paper was found. Virtually nothing else was in the room. Combs was allegedly told that he was not under arrest and that he was free to go.

Green was then found in room 1022. Green told the agents that he was "to meet a lady or be with a lady." R.T. at 334. A search of the room revealed only Green's personal effects. Apparently, both men were arrested shortly after the searches.

At trial, the agents testified to these events, including the statements made to them by Fleishman. The agent who had observed Green and Combs in the lobby of the Pacifica Hotel testified about his experience in undercover investigations, and was permitted to testify that Combs was acting as a "look-out." In addition, the Government called Bruce Greenwood and qualified him as a handwriting expert. Greenwood

concluded that "there are definite indications" that Combs had made the numerical notations on the paper found in room 1021, and that "most probably" Green had not. R.T. at 432. Greenwood testified on cross-examination that due to the limited amount of writing involved, his opinion was necessarily inconclusive. The jury returned a verdict against all the defendants on all counts.

*Combs' Fourth Amendment Contentions*

Combs argues that the Ramada Inn slip containing numerical notations was illegally seized during the warrantless search of Room 1021 and that his statements made before, during, and after the search were illegally obtained. The district court denied Combs' pre-trial motion to suppress this evidence finding that Combs was not detained or in custody, and that Combs' consent to the search of the room was voluntarily given. (R.T. at 91–92).

 The determination whether consent to search was voluntarily given is a question of fact, and the district court's finding of voluntariness will be reversed only if clearly erroneous. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *United States v. Tavelman*, 650 F.2d 1133, 1139 (9th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982). It is apparent from the record that Combs freely consented to the entry and search of Room 1021 of the Ramada Inn in Los Angeles on the evening of February 13, 1980. (C.R. at 6; R.T. at 36–38). The district court's finding of Combs' voluntary consent is therefore not clearly erroneous.

 The district court also found that Combs was free to leave during the search and questioning that ensued in Room 1021 on February 13, 1980. Whether a reasonable person would feel free to leave is the correct test to be applied in such an inquiry, and this court will not disturb such a finding unless it is clearly erroneous. *United States v. Booth*, 669 F.2d 1231, 1235–36 (9th Cir. 1981). Given the testimony received during the pre-trial hearing on the suppression motion that Combs was expressly in-

formed that he was free to leave, we cannot conclude that the district court's finding here was clearly erroneous.

*Opinion Testimony of Agent Clayton that Combs was Acting as a "Lookout"*

Combs argues that the trial court erred in permitting Clayton to opine that Combs was acting as a "lookout" or engaged in "countersurveillance" activities on the evening of February 13, 1980 in the Pacifica Hotel. Combs contends that there was insufficient foundational testimony to establish the reliability of Clayton's expertise in the area of narcotics countersurveillance activities; that Clayton's testimony was tantamount to Clayton's testifying to his views of Combs' guilt; and, as such, was an opinion on an ultimate issue in the case which encroached upon the province of the jury. The Government argues that Clayton's opinion was permissible lay witness testimony under Fed.R.Evid. 701.[1]

Admission of expert testimony or lay opinion testimony is a matter within the broad discretion of the trial judge not to be disturbed unless it is manifestly erroneous. *United States v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979). We fail to find such error here. Whether lay or expert, we think much of Combs' argument is answered by Fed.R.Evid. 704,[2] which allows opinion testimony embracing an ultimate issue to be decided by a trier of fact. *See also United States v. Skeet*, 665 F.2d at 985.[3]

Testimony amounting to opinions on ultimate issues has been admitted in a number of cases. *See, e.g., United States v. Masson*, 582 F.2d 961 (5th Cir. 1978); *United States v. Milton*, 555 F.2d 1198 (5th Cir.

1977); and *United States v. McCoy*, 539 F.2d 1050 (5th Cir. 1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). In those cases, Fed.R.Evid. 704 was interpreted to allow testimony by government agents that defendants in gambling prosecutions were engaged in "laying off" bets, were "sub-bookmakers," or played other roles in various illegal gambling operations. In *Masson*, in particular, an FBI agent was permitted to testify, on the basis of extensive experience and knowledge of bookmaking operations and terminology, that Masson was a "sub-bookmaker." *See United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *remanded*, 653 F.2d 1253, *cert. denied*, —— U.S. ——, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982) (emphasizing the investigatory training and experience of law enforcement officers). Although testimony on this fact, like testimony from Clayton here that Combs was a lookout, was testimony to one of the ultimate issues in the case, the testimony was admitted since it was relevant and its probative value to the jury substantially outweighed its prejudice to the defendant. We think the same is true in this case.

Combs argues that Clayton's opinion that Combs was a lookout is tantamount to Clayton's testifying that Combs was guilty. Such a contention is answered by reference to authority cited by Combs. In *Masson*, the court was faced with defense counsel's continued efforts at showing the government agent's bias by asking for the agent's opinion of Masson's guilt. The answer to such a question was properly prohibited. 582 F.2d at 963 n.5. The court proceeded, however, to admit the agent's opinion that Masson was a "sub-bookmaker." The Fifth Circuit, therefore, recognizes the difference

---

**1.** Fed.R. of Evid. 701 provides:

 "Rule 701. Opinion Testimony by Lay Witnesses

 "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

**2.** Fed.R. of Evid. 704 provides:

 "Rule 704. Opinion on Ultimate Issue

 "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

**3.** As the Advisory Committee Notes on Proposed Rule 704 state: "The basis usually assigned for [the prior] rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.'" *Id.* (quoting 7 Wigmore § 1920, p. 17.)

between opinions of a defendant's guilt or innocence and expert testimony regarding the various roles played by persons involved in illegal enterprises. We believe, as well, that the distinction does and should exist.

■ As foundation for his testimony, Clayton stated that he had been involved in over 250 undercover narcotics operations in his nine years with the DEA, that it was common to observe a member involved in narcotics transactions acting as a lookout, that Clayton had personally witnessed narcotics transactions involving lookouts in at least half of such investigations, and he described the factors he uses to determine whether a person is performing countersurveillance. (R.T. at 306–07). Such foundation was sufficient for admission.

Combs objects to the fact that Clayton's testimony was founded solely upon observations of wholly innocent conduct—that of Combs merely looking around the Pacifica lobby in the area of a television in public view. For this very reason, however, Clayton's testimony was valuable to the jury. Because of Agent Clayton's personal knowledge of actions occurring on the evening of February 13, 1980, and because of his prior experience, he was able to provide valuable information to the jury regarding Combs' alleged innocent behavior. As in *Masson*, the testimony of Agent Clayton was relevant and we believe its probative value outweighed any prejudice it would have to Combs characterized as an opinion on an ultimate issue. Clayton was thoroughly cross-examined, and questions regarding the validity of Clayton's conclusions that Combs was acting as a lookout went to the weight of his testimony rather than its admissibility.

*The Handwriting Expert's Testimony*

After testifying to his qualifications as an expert in handwriting analysis, Bruce Greenwood of the Los Angeles Police Department testified that there were "definite indications" that Combs wrote the note found in Ramada Inn Room 1021. On cross-examination, Greenwood admitted that his opinion was qualified by the limited number of writings available for comparison and he could not provide a definite conclusion whether Combs indeed wrote the note. Greenwood also testified that he could not find any convincing evidence that Green had authored the note (R.T. at 432), nor could he conclude that the writing was made by anyone other than Peter Combs.

■ Combs asserts that the prejudice resulting from the limited level of certainty of Greenwood's testimony outweighed its probative value, citing to a number of cases where expert testimony was held to be inadmissible for its prejudicial impact. *See United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973) (proffered testimony of psychologist on the effects of stress on the perception of eyewitnesses properly excluded); *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977) (error to admit testimony by experts of newly developed scientific techniques of testing hair samples because there was no scientific acceptance of the techniques); *United States v. Green*, 548 F.2d 1261 (6th Cir. 1977) (admission of various types of expert testimony held inadmissible because it was of "both dubious relevance and cumulative.") We do not find the above cases applicable here and do not believe the district court abused its wide discretion or committed "manifest error" in admitting the Greenwood handwriting testimony. *See United States v. Baldwin*, 607 F.2d 1295, 1296 n.1 (9th Cir. 1979), and cases cited therein. Combs' protestations to the contrary notwithstanding, the real issue raised relates to the weight that Greenwood's testimony should have received, not its admissibility.

The requisites of Fed.R.Evid. 702 were met. Greenwood was properly qualified as a handwriting expert, and his testimony, regardless of the level of certainty as to his conclusions, was helpful in assisting the jury in its deliberation of the relevance, if any, of the note found in Room 1021.[4]

---

4. The Advisory Committee on the Proposed Federal Rules of Evidence noted:

"The rule [702] ... recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."

Greenwood provided the jurors with an extensive review of the principles of handwriting analysis he used while making the comparisons he made. The jury could, therefore, properly apply the principles to the facts of the case in order to reach their own conclusion regarding the suggested authorship of the note.

■ The cases cited by Combs regarding the inadmissibility of certain types of expert testimony are inapposite here.[5] Those cases are concerned with the possible prejudice to the defendant's right to a fair trial of admitting testimony of purported experts based upon insufficiently substantiated scientific theories, techniques or tests.[6] It is undisputed that handwriting analysis is a science in which expert testimony assists a jury. *See generally*, 32 C.J.S. *Evidence* §§ 612–622 (1964). *See also United States v. Spencer*, 439 F.2d 1047, 1049 (2d Cir. 1971) (handwriting expert's testimony that the alleged forged securities were "probably prepared" by the defendant held admissible). All that is really disputed here is that Greenwood's opinion was inconclusive. To the extent that Greenwood's testimony lacked certainty, that uncertainty was probed extensively during cross-examination. Absolute certainty of result is not required for admissibility. *United States v. Baller*, 519 F.2d 463, 466 (4th Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). Combs' issue with the certainty of Greenwood's testimony, therefore, goes to the weight given the testimony; the district court did not abuse its discretion in admitting it.

*Admissibility of Coconspirator Hearsay Statements*

Green and Combs contend that hearsay declarations of Leslie Fleishman were improperly admitted into evidence against them. At trial, agents testified about various statements Fleishman made regarding the existence, location, and activities of his alleged confederates. For example, Agent Needham testified that Fleishman repeatedly referred to "his people" from the San Fernando Valley area who would bring the cocaine to the area of the Los Angeles International Airport for delivery. Fleishman also allegedly told Needham that his people had rooms in the Ramada Inn hotel, located across the street from the Pacifica Hotel in which the cocaine was eventually delivered to the agents by Fleishman on the evening of February 13, that he was going to the lobby of the Pacifica Hotel prior to the delivery to confer with "his people," and that his people insisted on restricting the first delivery to 480 grams.

■ Under Fed.R.Evid. 801(d)(2)(E), statements by a coconspirator made in furtherance of the alleged conspiracy[7] are admissible against a defendant if evidence from a source apart from the statements established that a conspiracy existed and that the member against whom the conversation is introduced had knowledge of, and participated in, the particular conspiracy alleged. *United States v. Federico*, 658 F.2d 1337, 1342 (9th Cir. 1981); *United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977). The court, not the jury, determines the admissibility of coconspirator hearsay testi-

5. Because of this observation, it is unnecessary for us to determine whether the four tests stated in *United States v. Amaral*, 488 F.2d at 1153, have survived the enactment of Rule 702 as additional judicial requirements regarding the admissibility of expert testimony in criminal cases. Apparently, the Sixth Circuit has adopted the four tests stated in *Amaral* as such. *See United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977).

6. This court has interpreted *Amaral* and other cases to stand for the proposition that "[a] necessary predicate to the admission of scientific evidence is that the principle upon which it is based 'must be sufficiently established to

have gained general acceptance in the particular field to which it belongs.'" *United States v. Kilgus*, 571 F.2d 508, 510 (9th Cir. 1978) (quoting *United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977), quoting *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923)).

7. Fleishman's statements were, without question, in furtherance of the conspiracy. Statements concerning the whereabouts of Fleishman's partners who allegedly controlled with Fleishman the delivery of cocaine and amounts to be delivered are declarations furthering the common objectives of a conspiracy to sell a controlled substance. *See United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979).

mony. *Federico*, 658 F.2d at 1342; *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964), *reh. denied*, 377 U.S. 1010, 84 S.Ct. 1902, 12 L.Ed.2d 1058 (1964). Before admitting such statements, this court requires substantial independent evidence of the existence of the conspiracy, and slight evidence of the defendants' connection with the conspiracy. *Federico*, 658 F.2d at 1342 n.7; *United States v. Fried*, 576 F.2d 787, 793 n.7 (9th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). The independent evidence may be circumstantial, *Testa*, 548 F.2d at 853; the order of proof is within the discretion of the trial judge, *Testa*, 548 F.2d at 852; *United States v. Knight*, 416 F.2d 1181, 1185 (9th Cir. 1969); and the facts presented must be viewed in the light most favorable to the Government. *Federico*, 658 F.2d at 1343.

■ With the above standards in mind, we believe the district court properly admitted Fleishman's statements as to Green and Combs.[8] The evidence independent of Fleishman's statements was sufficient to establish a prima facie conspiracy and the requisite slight evidence of Green's and Combs' connections. Fleishman's actions giving rise to inferences of a conspiracy include his telephone calls from Room 928 of the Pacifica purportedly attempting to contact his partners, and repeated attempts to reach them at the number he had written down; Fleishman's paging of Joseph Cotton in an apparent attempt to contact a partner or partners in the lobby of the Pacifica Hotel; his meetings, during critical phases of the negotiations, with Green and Combs in the lobby of the Pacifica Hotel; and his repeated trips between the Pacifica and the Ramada Inn, providing an inference that Fleishman was meeting to reach agreements with his partners regarding the impending transaction.

Green's and Combs' actions, when added to Fleishman's, provide additional independent evidence of the existence of a conspiracy and their connections with it. Green met with Fleishman in the Pacifica lobby during the negotiations of the transaction, while Combs was observed acting as a lookout engaged in countersurveillance activities prior to the brief meeting between all three appellants. After this meeting, Green was heard to ask whether any messages had been received at the Pacifica registration desk for a Steve Cotton,[9] and Green rented two rooms under a false name at the Ramada Inn, wherein was found Green and Combs, plus a paper with notations corresponding to the price and terms of the eventual cocaine transaction. This evidence, while circumstantial, is sufficient independent evidence of a conspiracy and sufficient to show Green's and Combs' connections thereto in order to have admitted Fleishman's statements under Rule 801(d)(2)(E).

■ Combs and Green argue that their Sixth Amendment confrontation rights were violated by the admission of Fleishman's statements regarding his partners or "his people." The district court, reviewing the statements offered during the pre-trial suppression hearing under *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), concluded that the statements were sufficiently reliable to preclude any confrontation problems under *Dutton*. R.T. at 99. We agree.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court was presented with a case requiring a discussion of the relationship between exceptions to the hearsay rules of evidence and the defendant's rights to confront witnesses under the Sixth Amendment. The Court held that the Confrontation Clause contains both a necessity requirement (usually fulfilled by proof that the declarant is unavailable[10] for

8. As to Fleishman, his own declarations are admissible as to him. *See Klein v. United States*, 472 F.2d 847, 850 (9th Cir. 1973); *United States v. Testa*, 548 F.2d 847, 853 n.4 (9th Cir. 1977).

9. The Government's theory about Fleishman's paging "Joseph Cotten" and Green's request regarding information received about "Steve Cotten" is that the conspirators got their code names mixed up. R.T. at 679.

10. An assertion of the constitutional right

cross-examination) and a reliability requirement.

Despite the statement in *Ohio v. Roberts* that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception," 448 U.S. at 67, 100 S.Ct. at 2540, this court has rejected the notion that "mere satisfaction of requirements for the coconspirator exception automatically meets all possible confrontation clause infirmities." *See United States v. Perez*, 658 F.2d 654, 660 n.5 (9th Cir. 1981). *Cf. United States v. Peacock*, 654 F.2d 339, 349 (5th Cir. 1981); *Ottomano v. United States*, 468 F.2d 269, 271 (1st Cir. 1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973), *reh. denied*, 410 U.S. 948, 93 S.Ct. 1383, 35 L.Ed.2d 616 (1973). More specifically, this court has remarked:

> "Although the hearsay rules and the confrontation clause promote similar values, admissibility under a hearsay exception does not *a fortiori* dissolve the court's obligation to review the record for constitutional infirmity.... This principle has particular force when the admission of evidence is sought under the coconspirator exception: Admission under the coconspirator exception does not automatically guarantee compliance with the confrontation clause."

*United States v. Perez*, 658 F.2d at 660. Therefore, the relevant factors for testing the reliability of coconspirator's statements suggested in *Dutton v. Evans*, 400 U.S. at 88–91, 91 S.Ct. at 219–220, are still to be considered in this circuit for judging whether a defendant's confrontation rights were violated by the admission of coconspirator statements against him. *See Perez*, 658 F.2d at 661.

Prior to *Perez, Dutton* was interpreted by this court as follows:

> "Under *Dutton* an analysis must be made to determine whether there are sufficient indicia of reliability to permit the introduction of the hearsay declarations in spite of the lack of opportunity for the

defendant to cross-examine the declarant."

*United States v. Weiner*, 578 F.2d 757, 771 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978), *reh. denied*, 439 U.S. 1135, 99 S.Ct. 1060, 59 L.Ed.2d 98 (1979). The court continued:

> "The relevant factual inquiry is whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration."

*Id.* at 772 (*quoting United States v. Adams*, 446 F.2d 681, 683 (9th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971)).

The four reliability factors discussed in *Dutton* and *Perez* are: (1) whether the declaration contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime. *Perez*, 658 F.2d at 661. The reliability factors discussed in *Dutton*, however, are not to be considered exhaustive, nor are all factors required to be present in order to admit the declarations. *Id.* An additional factor, sometimes discussed and its relevance debated, is whether the testimony of the coconspirator was "crucial" or "devastating." *Id., see also United States v. Snow*, 521 F.2d 730, 735 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976), and *United States v. King*, 552 F.2d 833, 846 n.16 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

Green focuses on two of the factors. He contends that Fleishman was motivated to lie about his confederates and that the statements were crucial and devastating to

---

against self-incrimination makes the declarant coconspirator unavailable for purposes of The Confrontation Clause analysis. *See United States v. Weiner*, 578 F.2d 757, 771 (9th Cir. 1978).

his defense. We disagree. Green's protestations to the contrary notwithstanding, there is little reason to believe that Fleishman's statements about his partners or "his people" were fabrications.[11] Fleishman obviously did not believe Agents Needham, Delisse and Hobdy were DEA agents so as to be motivated to lie to them. *See United States v. Snow*, 521 F.2d at 735; *United States v. Puco*, 476 F.2d 1099, 1104 (2d Cir.), *cert. denied*, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). In addition, the repeated statements regarding Fleishman's people were corroborated by Fleishman's phone calls, writing down the number where his cohorts could be reached, his repeated attempts to reach them only to discover that they were actually in the lobby of the Pacifica, and Fleishman's actual meeting with Green and Combs in the lobby. All of this evidence supports a conclusion that Fleishman's statements that he needed to confer with his confederates during the course of the drug transaction were reliable. This evidence is added to Fleishman's other actions on the evening of February 13th that corroborate his statements about partners, including his repeated movements between the Pacifica, the site of the drug negotiations and eventual delivery, and the Ramada, where Green and Combs had in fact rented two rooms under a false name. In the face of this corroborating evidence provided by the circumstances under which the statements were made, we cannot find Green's theory of Fleishman's motivations for lying to the agents plausible.

Nor do we agree with Green and Combs that Fleishman's statements were crucial and devastating because there was significant evidence substantiating Green's and Combs' involvement in the conspiracy. It does not change our conclusion that the bulk of this substantiating evidence is circumstantial. *See United States v. King*, 552 F.2d at 845.

Employing the *Dutton* approach as we have, we hold that Fleishman's declarations contained sufficient indicia of reliability and were properly admitted.

### Sufficiency of the Evidence

All appellants join in a contention that the evidence was insufficient to establish the existence of a conspiracy and Green and Combs, in particular, argue that the evidence was insufficient to demonstrate their alleged knowledge of and participation in the conspiracy. All appellants moved for a judgment of acquittal under Fed.R.Crim.P. 29 at the conclusion of the Government's case, and such motion was denied. The challenge here includes a request to review the propriety of the denial of the Rule 29 motion as well as the jury's verdict.

Our role is to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Federico*, 658 F.2d 1337, 1343 (9th Cir. 1981); *United States v. Bailey*, 607 F.2d 237, 243 (9th Cir. 1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980). The question to ask is not whether the evidence excludes every hypothesis except guilt, but whether the trier of fact could reasonably arrive at its conclusion. All reasonable inferences must be drawn in favor of the Government, and circumstantial evidence is sufficient to sustain a conviction. *Federico*, 658 F.2d at 1343–44.

The essential elements of conspiracy are "an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Bailey*, 607 F.2d at 243 (quoting *United States v. Friedman*, 593 F.2d 109, 115 (9th Cir. 1979)). Once the existence of a conspiracy is shown, "evi-

---

11. Green's theory is that Fleishman was motivated to lie about partners because of the dangerous business involved and the possible enhancement in Fleishman's bargaining position from giving the DEA agents the impression that Fleishman had partners. In the face of all of the other corroborating circumstances in the record, the district court did not err in discounting such a theory.

dence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy." *Federico*, 658 F.2d at 1344 (quoting *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977) (emphasis in original)).

■ When Fleishman's statements about his confederates, their whereabouts, their agreements to supply certain amounts of cocaine during the first transaction, etc., are added to the independent evidence discussed in support of the admission of these statements, we find sufficient evidence to support the jury's guilty verdict on the conspiracy counts. There is little question of Fleishman's connection to the conspiracy. As for Green and Combs, we disagree that their connections to the conspiracy were shown only by their "mere presence" in the general area of the transaction. *See United States v. Weaver*, 594 F.2d 1272, 1274 (9th Cir. 1979); *United States v. Cloughessy*, 572 F.2d 190, 191 (9th Cir. 1977). The jury could have found it probable that Combs wrote the note found in Room 1021.

If the jury found the evidence about Combs' countersurveillance activity credible, such is sufficient to sustain his conviction. *United States v. Perez*, 491 F.2d 167, 191 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). Although circumstantial, Green's meeting with Fleishman at the Pacifica, his renting of two rooms under a false name at the Ramada across the street, and his request at the Pacifica desk for messages for Steve Cotton were sufficient to demonstrate his connection with the conspiracy, however slight his actual role. We believe that a rational trier of fact could have found, beyond a reasonable doubt, that the evidence established the essential elements of a conspiracy and the appellants' knowing participation in the same.

*Jury Instructions*

Green maintains that it was error for the court to have rejected his proposed jury instructions regarding burden of proof. Green requested that the district court read Devitt and Blackmar Instruction § 11.14,[12] or a modified version of it.[13] The court

12. Devitt and Blackmar § 11.14 reads:
"§ 11.14 Burden of Proof—Reasonable Doubt
"The law presumes a defendant to be innocent of crime. Thus a defendant, although accused, begins the trial with a 'clean slate'—with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. So the presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.
"It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.
"The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.
"The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defend-

ant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.
"So if the jury, after careful and impartial consideration of all the evidence in the case, has a reasonable doubt that a defendant is guilty of the charge, it must acquit. If the jury views the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should of course adopt the conclusion of innocence."
*Id.*, 3d Ed., 1977.

13. Counsel for Green made the following request:
"I would particularly like the language in there that the defendant begins a trial with a clean slate, and also the later language that the defendant is never to be convicted on mere suspicion or conjecture. That is going to be the thrust of the argument in my case: I wish to argue that there may be some suspicions, but I want to be able to tell the jury that a defendant is never to be convicted on the basis of mere suspicion or conjecture.
"I note there is nothing in the Court's instructions that covers that type of instruction." R.T. at 649.

read a different modified version.[14] We find no reversible error here.

■ Instructions need not be given in the precise language requested by the defendant. The adequacy of jury instructions is determined by examining the instructions as a whole, and the refusal to give a requested instruction will not be overturned if the jury charge as a whole adequately covers the theory of the defense. *United States v. Skinner*, 667 F.2d 1306, 1310 (9th Cir. 1982); *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lee*, 589 F.2d 980, 985 (9th Cir.), *cert. denied*, 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979); *United States v. Kaplan*, 554 F.2d 958, 968 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).

■ Green's main contention is that he was unable to provide the jury with language that a conviction could not be justified on mere speculation or conjecture. The many instructions given stating that the jury must find each element of each offense beyond a reasonable doubt adequately covered the point desired by Green.[15] The court's refusal to modify the burden of proof instruction was therefore not error.

14. The court's primary burden of proof instruction read as follows:

"A defendant is not required to prove his innocence. He is presumed to be innocent unless the evidence proves beyond a reasonable doubt that he is guilty. This law applies to every element of the offense charged and must be considered in regard to all instructions. If there is a reasonable doubt as to a defendant's guilt, he is entitled to an acquittal.

"It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based on reason and common sense. Proof beyond a reasonable doubt must be of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important and vital of his own affairs.

*Entrapment Instruction*

Fleishman argues that it was error for the district court to have refused his proposed entrapment instruction. It was not.

■ Whether there exist issues of fact as to a defense of entrapment is properly a question for the trial judge, the standard of review being abuse of discretion. *United States v. Shapiro*, 669 F.2d 593 (9th Cir. 1982); *United States v. Diggs*, 649 F.2d 731, 738 (9th Cir.), *cert. denied*, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981). The primary focus on the appellate review should be on the defendant's predisposition to commit the crime rather than on the character of the Government agents' actions. *Id.* Although only slight evidence is needed to create a factual issue and get the defense to the jury, this evidence must at least suggest that the defendant was initially unwilling to commit the crime, or that Government involvement planted the criminal design in the defendant's mind. *Id.* at 738–39. In arguing that there was no evidence of criminal predisposition, the appellant concentrates on one of the factors listed in *Diggs* as bearing on the inquiry, namely, whether the initial suggestion of criminal activity was made by the Government. As we have held, "[m]ere assistance by government agents in the commission of a crime, however, is insufficient to raise the issue of entrapment." *United States v. Ratcliffe*, 550 F.2d 431, 434 (9th Cir. 1976).

"The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." R.T. at 797.

15. Moreover, the following instruction given adequately presented Green's theory as argued by Green's counsel during closing statements. (*See* R.T. at 719):

"Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that the defendant aided and abetted the crime, unless you find beyond reasonable doubt that the defendant was a participant and not merely a knowing spectator."
R.T. at 819.

The record contains no evidence that Fleishman displayed any reluctance to engage in the drug transaction, and the fact that a Government informant made the initial contact is overshadowed by Fleishman's uninduced willingness to conclude a deal. Fleishman did not need to be persuaded by the Government agents.

Fleishman's criminal predisposition, therefore, eliminated entrapment as a potential defense. Fleishman bragged of his experience and capabilities in counting large amounts of money. Fleishman informed the agents that this last ten pound transaction represented the end of a large amount of narcotics dealing. Moreover, Fleishman's familiarity with prices and the means of supplying narcotics demonstrated his predisposition. There was no evidence to contradict the fact that Fleishman was ready, willing, and able to engage in narcotic transactions and the agents merely provided him a propitious opportunity to do so.

It was, therefore, proper for the district court to refuse to instruct the jury regarding the law of entrapment.

*Prosecutorial Comments*

 Fleishman argues that certain closing arguments made by the Government impermissibly commented upon the appellants' failure to testify and improperly shifted the burden of proof to the appellants. These arguments are devoid of merit. The test to judge impermissible comment upon a defendant's assertion of his Fifth Amendment right not to testify is whether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify. *United States v. Wasserteil,* 641 F.2d 704, 709 (9th Cir. 1981). A prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased as to call attention to defendant's own failure to testify. *United States v. Passaro,* 624 F.2d 938, 944 (9th Cir. 1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981). The comments that Fleishman finds objectionable did not directly refer to any of the appellants' failure to take the stand.[16] The comments refer to the defense counsel, rather than the appel-

16. The portions of the Government's closing arguments objected to are as follows:

"I want you to listen carefully to the defense lawyers and weigh the testimony in the light of their arguments, as well as in the light of the argument that I am making to you. For example: I'm sure that one of the defense lawyers will try to tell you that Mr. Green met with Mr. Fleishman and yet he wasn't involved in a narcotics conspiracy. When Mr. Fleishman said he was going downstairs to meet his partners, if Mr. Fleishman and Mr. Green had discussed it before, then you wouldn't expect him to be surprised to see Mr. Fleishman and you wouldn't be surprised about Mr. Green going over to the hotel clerk and requesting a message for a name that was identical to the name used by Mr. Fleishman when he called downstairs to try and contact his partners in this narcotics scheme. Finally, ladies and gentlemen, if Mr. Combs wasn't one of the conspirators, what was he doing in that hotel room in the Ramada Inn on a Wednesday night? He was in that room registered to another person under a false name with a fake address, whose whereabouts he didn't know and where a piece of paper was found which matched up to the numbers in the narcotic transaction going on in the hotel he had been in just a few hours before. Why did Mr. Combs finally say he had done noth-

ing wrong? I would like you to listen very carefully to what the defense lawyers say about this. If they don't seem to address themselves to that in their argument, if they don't seem to really resolve these questions, I think you can ask yourselves why not. (R.T. 688–689)

\* \* \* \* \* \*

"Well, ladies and gentlemen, the defense has no burden at all to bring forward evidence. If there was exculpatory evidence, if there were fingerprints present that showed someone else carried the drugs, if there were telephone calls recorded that would show that other people were involved in a conspiracy, why didn't the defense bring it in? "They are not required to produce evidence, but they are allowed to produce evidence. And they can call any witness they think may help their case. If they had witnesses that would exculpate them, why didn't they call these witnesses? Why didn't Mr. Green call the woman he was going to spend the evening with? After all, they are in trial, and if they have exculpatory evidence they can present it to you, if they choose. Why didn't that person testify, if there was such a person."

(R.T. 789).

lants by direct reference, and when taken in context and fairly construed, the comments were not manifestly intended or of such a character that the jury would necessarily take them as a comment on the appellants' failure to testify.

As for the argument that the comments impermissibly shifted the burden of proof to the appellants, one of the prosecutor's comments objected to by Fleishman contained a direct statement to the contrary, i.e., "[the appellants] are not required to produce evidence, but they are allowed to produce evidence." Moreover, the court's instructions to the jury (R.T. at 797) were sufficient to cure any prejudice that appellants may have suffered from any impermissible comments. *See United States v. Smith,* 441 F.2d 539, 540 (9th Cir. 1971).

*Use of Prior Uncounseled Mexican Convictions in Sentencing*

The appellants argue that they were improperly sentenced due to the district court's expressed consideration of their prior, uncounseled Mexican convictions for drug-related offenses. Appellants rely upon *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), where the Court held that Tucker was entitled to resentencing because his sentence had been enhanced by a judge who was unaware that some of Tucker's prior convictions were uncounseled and, therefore, unconstitutional under *Gideon v. Wainwright,* 372 U.S. 335, 82 S.Ct. 792, 9 L.Ed.2d 799 (1963). Fleishman expressly waived any objection to the

trial court's consideration of his prior Mexican conviction;[17] Combs joined Green's motions for exclusion of such consideration.[18]

The Government first argues that by the terms of the Treaty on the Execution of Penal Sentences Between the United States and Mexico,[19] the appellants waived all objections to the trial court's reliance upon their Mexican convictions for use in sentencing. In the alternative, the Government contends that *Tucker* is inapplicable since the policies expressed in *Tucker* would not be promoted by applying the rule in this case.

The district judge found appellants' waivers to any challenge of their Mexican convictions dispositive of the issue, relying expressly on the case of *Rosado v. Civiletti,* 621 F.2d 1179 (2d Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). In *Rosado,* the Second Circuit rejected a constitutional attack upon the terms of the prisoner exchange treaty holding that the challenging prisoners were not denied due process of law by operation of the treaty provisions because they had voluntarily and intelligently waived their right to challenge the validity of their Mexican convictions in this country.[20] Since *Rosado,* this court has reached a similar result. *See Pfeifer v. United States Bureau of Prisons,* 615 F.2d 873 (9th Cir.), *cert. denied,* 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1980). Other challenges to the prisoner exchange treaties and their application have been rejected.

**17.** In open court, during his sentencing hearing, Fleishman waived any objection he had to the consideration of his prior Mexican conviction in his sentence. R.T. at 847. We are not impressed by Fleishman's arguments on this appeal that such a waiver was "conditional" in reliance on the trial court's conclusion of law that the Mexican conviction was valid. We agree with the Government that such waivers for obvious tactical purposes during sentencing should not now be rewarded on appeal by unpersuasive assertions that such waivers were conditional. Nonetheless, the result we reach would be no more satisfying to Fleishman, even were we to accept his conditional waiver argument.

**18.** Appellant Green supplied the district court with a memorandum and affidavit alleging the circumstances surrounding his treatment and

conviction by the Mexican judicial system for purposes of excluding *in limine* any reference to this conviction during trial. C.R. at 15. At that point in the proceedings, Combs joined in the motion without providing the trial court with similar facts surrounding his treatment and conviction. A sentencing memorandum prepared by Green does not appear of record.

**19.** Treaty on the Execution of Penal Sentences, November 25, 1976, United States-Mexico, 28 U.S.T. 7399, T.I.A.S. No. 8718. The Treaty and others were accompanied with implementing legislation by Act of Oct. 28, 1977, Pub.L.No. 95–144, 91 Stat. 1212; 10 U.S.C. § 955; 18 U.S.C. §§ 3244, 4100–4115.

**20.** Both nations involved and the prisoner must consent to the change in custody. *See Rosado v. Civiletti,* 621 F.2d 1179, 1187–88 and n. 20.

*See, e.g., Boyden v. Bell*, 631 F.2d 120 (9th Cir. 1980), *cert. denied*, 454 U.S. 1051, 102 S.Ct. 618, 70 L.Ed.2d 604 (1981) (U.S. authorities did not violate the terms of the treaty implementing legislation by adjusting a prisoner's remission credits and reclassifying him as a recidivist offender); and *Kanasola v. Civiletti*, 630 F.2d 472 (6th Cir. 1980), *cert. denied*, 450 U.S. 930, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981) (challenge to Article V of the prisoner exchange treaty between the U. S. and Canada based upon an alleged conflict with the Suspension Clause of Art. I, § 9 of the U.S. Constitution rejected).

None of the above cases, however, dealt with the issue presented here. Neither *Rosado* nor *Pfeifer* interpreted Article VI of the Treaty to prohibit an effort to avoid the collateral consequences of the Mexican conviction in unrelated proceedings. In the proceedings below, neither Combs nor Green sought to challenge the validity of their continued incarceration in United States prisons following their transfer from Mexican prisons. They did seek to exclude any reference to these convictions during trial and for purposes of sentencing. At least in regard to sentencing, neither *Rosado* nor *Pfeifer* prohibit a defendant from bringing to a sentencing judge's attention the circumstances surrounding the foreign conviction.

In the instant case, Combs and Green informed the court that their Mexican convictions and sentences were received without the aid of counsel, among other infirmities,[21] in order for the court to determine the applicability of *Tucker.* Combs' and Green's waiver of their right to challenge the validity of their continued incarceration in this country pursuant to Article VI of the Treaty does not prevent them from challenging the collateral consequences of those convictions. *See* Article (6) of the Treaty.[22]

█ Nor do we believe that this is an appropriate case for the exercise of restraint in a matter touching foreign relations as suggested by the Government.[23] For the very reasons expressed immediately above, we do not believe that a criminal defendant's rights to challenge the collateral consequences of his uncounseled, foreign conviction will impair this country's ability to enter into treaties of this kind. The appellants here apparently served the balance of their sentences in this country as required under the terms of the treaty. Their position here is one challenging the effect their foreign conviction may have on a sentence received for a separate offense

**21.** Green's alleged treatment was summarized in the following manner:

"[D]efendant STEPHEN PRICE GREEN was arrested in Mexico in 1974 and charged with possession of cocaine. During the interrogation following the arrest, Mexican authorities repeatedly beat the defendant and applied electric cattle prods to his testicles and nipples. After many hours of this treatment, defendant was told to sign his name to a document, written in Spanish, which he did not understand. He was later told that the document was a confession.

"Thereafter, STEPHEN PRICE GREEN was incarcerated in Lecumberri, a notorious Mexican prison commonly known as the 'Black Castle.' While at Lecumberri, GREEN was confined under barbaric conditions and was subjected to brutal and sustained physical torture. After thirteen months of confinement, GREEN was directed to go to the control tower where he was informed by a prison official that he had been tried and convicted, *in absentia*, without benefit of judge, jury, or legal representation, and had been sentenced to serve an additional six years of imprisonment at Lecumberri."
C.R. 15. Although not designated in the record on appeal, we will assume Combs presented the court with similar evidence.

**22.** Article V, paragraph (6) reads:

"(6) The fact that an offender has been transferred under the provisions of this Treaty shall not prejudice his civil rights in the Receiving State in any way beyond those ways in which the fact of his conviction in the Transferring State by itself effects such prejudice under the laws of the Receiving State or any State thereof."

**23.** The Government argues that resolution of this issue in favor of the appellants could have an unpredictable impact upon relations with Mexico, suggesting that this court exercise the traditional restraint in becoming involved in issues which are potentially entangled in the conduct of foreign affairs, citing *Romero v. International Terminal Operation Co.*, 358 U.S. 354, 383, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959).

committed in this country. As mentioned, the Treaty is neutral with respect to the collateral consequences to be accorded the foreign conviction.[24] Combs and Green, therefore, properly asserted their rights under *Tucker* at their sentencing hearings.

Resentencing is not required, however. *Tucker* has been interpreted by this court to allow a challenge to a sentence when three requirements are demonstrated: (1) a prior conviction rendered invalid by *Gideon v. Wainwright*; (2) the sentencing judge's mistaken belief that the prior conviction was valid; and (3) enhancement of the defendant's sentence because of it. *Owens v. Cardwell*, 628 F.2d 546, 547 (9th Cir. 1980); *Farrow v. United States*, 580 F.2d 1339, 1345 (9th Cir. 1978).

 Assuming the first and third requirements existed,[25] we believe the second requirement has not been met for a successful challenge under *Tucker* and *Farrow* to the sentences received in this case. The district court was under no mistaken belief that the prior Mexican convictions had comported with the Sixth Amendment. The district court was apprised of the alleged infirmities attending the Mexican convictions. The district court was, therefore, under no mistaken impression that the convictions were constitutionally valid under this country's laws as was the sentencing court in *Tucker*. The record indicates that the district court enhanced the appellants' sentences because of the *fact* that they had been involved in drug-related offenses and had not learned from their experiences. Consideration of the appellants' prior involvement with cocaine is permissible. *See, e.g., United States v. Wondrack*, 578 F.2d 808 (9th Cir. 1978); *Serapo v. United States*, 595 F.2d 3 (9th Cir. 1979), and *Gelfuso v. Bell*, 590 F.2d 754 (9th Cir. 1978). We therefore find no basis for resentencing.[26]

All appellants' convictions on all counts are

AFFIRMED.

---

**24.** See note 22, *supra*.

**25.** The record clearly demonstrates that the trial judge intended to consider the prior Mexican convictions in his sentencing decision. We can assume that this consideration led to sentence enhancement. We can also assume that the trial judge credited the evidence provided at least by Green regarding the fact that his foreign conviction was uncounseled.

**26.** Combs also contends that he was improperly sentenced to a special parole term on Count I. Such was simply not the case. *See* Judgment and Probation Commitment Order of June 19, 1980, C.R. 50 B, and R.T. at 882.