**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rafael SANDOVAL–VILLALVAZO,
Defendant-Appellant.**

**No. 79–1396.**

United States Court of Appeals,
Ninth Circuit.

June 9, 1980.

Michael A. Brush, Santa Monica, Cal., for defendant-appellant.

Donald Etra, Asst. U.S. Atty., Los Angeles, Cal., argued, for plaintiff-appellee; Andrea Sheridan Ordin, U.S. Atty., Los Angeles, Cal., on brief.

Before MERRILL and FERGUSON, Circuit Judges, and SMITH *, District Judge.

RUSSELL E. SMITH, District Judge:

Sandoval-Villalvazo (Sandoval), who was convicted of violations of the narcotic laws, appeals.

Viewing the evidence in the light most favorable to the United States and drawing permissible inferences from the facts, the trial court could have found as follows:

On October 31, 1978, codefendant Rosales, by telephone, advised Sepulveda, an undercover Drug Enforcement Administration (DEA) agent, that he had a source and could deliver approximately 15 ounces of heroin on the following day. On the next day Sepulveda and other agents went to a Skaggs parking lot in Santa Ana. Sepulveda called Rosales, told him where he was, and then waited. At approximately 5:00 P. M. Rosales appeared at the parking lot in a red pickup driven by codefendant Velasquez. In the course of a conversation, Rosales indicated to Sepulveda that they weren't having any success in finding the source—the owner of the merchandise. Rosales then pointed to Velasquez and said, "He is going to call him now." Velasquez left. Sepulveda then took Rosales to the undercover truck and showed him the money with which the purchase would be made. Velasquez reappeared and said he couldn't find "the man." Rosales then said, "Don't worry. I have talked to the guy. We are

* The Honorable Russell E. Smith, Senior Unied States District Judge for the District of Montana, sitting by designation.

going to his house right now . . . ." He then asked Sepulveda to wait—to please not leave—and that something would be done that day. Velasquez and Rosales left in the red pickup, followed by Agent Alexander. Rosales was dropped at the Durango Restaurant, and Velasquez driving alone, followed by an agent, went to the 2500 block on West Pomona where he conversed with a driver of a parked gray-colored 1975 Grand Prix automobile. This was between 5:30 and 6:15 P. M.

At about the same time, 6:15 P. M., Sepulveda called Rosales at the Durango Restaurant and was told that they were still having trouble finding "the man" but that Velasquez had gone looking for him. Rosales again repeated, "But don't leave, please don't leave. We are going to do something." About 6:30 P. M. Sepulveda again called Rosales at the same restaurant and was advised that Velasquez had located "the man," the owner of the merchandise. Between 7:20 and 7:30 P. M. Rosales and Velasquez returned to the parking lot. Sepulveda asked Rosales if he had the heroin, and Rosales said, "No. The man will be bringing it with him." Velasquez in the meantime went to the telephone. He came back, again left, and again came back and said that he couldn't find "the man." A short time later he left again and returned saying that the source was on his way. During this time Velasquez was highly agitated and was irritated by the failure of the source to appear. There was an argument between Rosales and Velasquez as to whether Velasquez should leave with the red pickup in search of the source and risk having the source miss the rendezvous in the absence of the pickup. Finally, however, Velasquez again left the parking lot, followed by the DEA agents.

In the course of these events Velasquez said to Rosales in the presence of the agents, "Your Campa Rafa, he has no compassion on those of us who are trying to make a buck or two . . . . Just because he has made his millions he doesn't worry about us." Sepulveda testified that he understood that "Campa Rafa" referred to Rosales' good friend Rafael (Sandoval).

After Velasquez left, Rosales told Sepulveda the source would arrive in a gray-colored Grand Prix.

Velasquez, again followed by Agent Alexander, went back to the 2500 block on West Pomona and arrived there shortly after 8:00 P. M. The Grand Prix was there. The driver of it, later identified as Sandoval, made a U-turn and closely followed the red pickup to the parking lot, once jumping a yellow light to keep up. They arrived in tandem about 8:30 P. M., and both parked. Velasquez then went to Sepulveda and told him that the heroin was in the pickup and that "the man—the owner" (nodding in the direction of Sandoval) wanted Rosales (by then arrested) and not Velasquez to deal with the buyer. At that time the agents pulled their guns and arrested Velasquez. The conversation preceding the arrest had taken about five minutes. During this time Agent Sepulveda was facing and observing the occupants of the Grand Prix. Sandoval sat in his car with the motor running and the lights on and watched Velasquez and Sepulveda talking; but when the arrest occurred he immediately put his car in reverse, screeched backward, and then sped forward in the direction of the two agents. He was stopped by a bullet fired into his tire by a DEA agent. Searching the red pickup, Sandoval found 252 grams of heroin. Bullets and a 45-calibre clip were found in the trunk of the Grand Prix. Sandoval, who had last worked in August 1978, when he had earned $600.00, had $300.00 in his possession.

■ Appellant urges that the statements of Rosales and Velasquez (undoubtedly prejudicial), which were made to the DEA agents in his absence, are hearsay. Statements made by one coconspirator during the course of and in furtherance of a conspiracy are admissible as vicarious admissions against another coconspirator. Fed.R. Evid. 801(d)(2)(E). It is required, however, that there be evidence, independent of the coconspirator's statements, establishing the existence of the conspiracy and connecting a defendant with the conspiracy. The evi-

dence proving the existence of the conspiracy was overwhelming.

With respect to Sandoval's connection with the conspiracy, the facts, in our opinion, warrant the conclusion that the following occurred:

■ On November 1, 1978, during the period between 5:00 P. M., when Velasquez first appeared on the scene, and about 8:30 P. M., when he was arrested, Velasquez was totally absorbed in his effort to sell heroin. The trial judge could infer that during that period of Velasquez' total absorption Sandoval first waited for him on Pomona Street and there he talked to him; by reason of some understanding between Velasquez and Sandoval, Sandoval again waited for Velasquez at the same place at a time about two hours later. On the second occasion Sandoval made a U-turn and purposefully followed Velasquez to the parking lot. At the parking lot he did not get out, as a shopper might have, but rather kept his motor running and his lights on. He observed Velasquez very closely and, when the arrest occurred, made a determined effort to escape. This, in our opinion, was proof, independent of the declarations of the coconspirators, connecting Sandoval with the conspiracy, and was sufficient to satisfy the standard of proof established by *United States v. Dunn*, 564 F.2d 348 (9th Cir. 1977).

■ We believe that the trial court was warranted in inferring that the statements made by the coconspirators, including the reference to "Campa Rafa," were designed to keep the potential buyers from leaving the scene and were, therefore, in furtherance of the conspiracy. About 3½ hours passed between the time Rosales first appeared at the parking lot and the arrest. Sepulveda commented to Rosales on their failure to find the source. A good part of the 3½ hours was spent in calling and looking for the source and on some occasions Velasquez said he couldn't find "the man." Twice Rosales urged Sepulveda to wait and assured him that something would happen. The statement as to "Campa Rafa" did tend to assure the potential buyers that there was a real source and inferentially tended

to explain the delay on the ground that the source was rich and could afford to keep people waiting.

■ It is urged that it was error to admit the statements of the coconspirators prior to the proof of Sandoval's connection with the conspiracy. The order of proof was within the discretion of the trial court. *United States v. Peterson*, 549 F.2d 654 (9th Cir. 1977); *United States v. Smith*, 445 F.2d 861 (9th Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971). The trial court did not abuse its discretion, and there was no error.

■ The argument that the evidence was insufficient to sustain the conviction is without merit. Once evidence sufficient to connect defendant with the conspiracy was properly admitted, the whole of the evidence was more than sufficient to convict.

Defendant sought to secure the testimony of one Sanchez, who was a passenger in the Grand Prix at the time it was in the Skaggs parking lot, and who was arrested along with the others. The trial initially was set for January 16, 1979, and Sanchez was subpoenaed for this setting. He did not appear. When codefendant Velasquez moved for a continuance, due to the involvement of new counsel, Sandoval decided not to oppose the continuance only after ascertaining that Sanchez would be available as a witness after January 16th. The trial was then continued until February 27, 1979; Sanchez was not subpoenaed for this second setting, and no subpoena was issued when the witness did not appear on February 27th. On Thursday, March 1, 1979, the court granted defendant a continuance until Monday, March 5, so that he could obtain the witness. Again no subpoena was issued. Sanchez did not appear when the trial was resumed on March 5th. The court granted defendant's request to be allowed to present the witness after the Government's rebuttal if he had appeared by that time. When the Government declared it had no rebuttal the defendant requested a 10-minute recess to attempt to secure the attendance of this witness. The court de-

nied this request and the Government made its closing argument. Then, for the first time, the court was advised that the witness had appeared. Defendant moved to reopen for the purpose of calling Sanchez. The motion was denied.

■ The rule is stated in *United States v. Hoyos*, 573 F.2d 1111, 1114 (9th Cir. 1978), quoting from *Leino v. United States*, 338 F.2d 154, 156 (10th Cir. 1964), as follows:

"When a continuance is sought to obtain witnesses, the accused must show who they are, what their testimony will be, that the testimony will be competent and relevant, that the witnesses can probably be obtained if the continuance is granted, and due diligence has been used to obtain their attendance on the day set for trial."

The record demonstrates that the defendant was aware of the problem of securing the attendance of this particular witness and chose not to issue a subpoena for him. After recessing from Thursday until Monday for the sole purpose of giving defendant an opportunity to procure the attendance of Sanchez, the court did not abuse its discretion in refusing another continuance, albeit a short one, nor in refusing to reopen the case after the Government had made its closing argument.

The judgment is affirmed.

FERGUSON, Circuit Judge, dissenting:

I must respectfully dissent.

The majority states correctly that out-of-court statements by one coconspirator during the course of and in furtherance of the conspiracy are admissible against another coconspirator where there is evidence independent of the coconspirator's statements establishing the existence of the conspiracy and the defendant's connection to it. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Weaver*, 594 F.2d 1272 (9th Cir. 1979); *United States v. Rosales*, 584 F.2d 870 (9th Cir. 1978); Fed.R.Evidence, 801(d)(2)(E). While the majority concedes that Valasquez's statement to Rosales was prejudicial, they fail to show that the statement was made "in furtherance of" the conspiracy.

The statement by Valasquez to Rosales was by far the most prejudicial of all the statements, yet it cannot in any way be considered a statement "in furtherance of" the conspiracy. It was, at best, idle conversation between two coconspirators. Mere conversation between conspirators or merely narrative declarations are not admissible as declarations in furtherance of the conspiracy. *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979); *United States v. James*, 510 F.2d 546 (5th Cir. 1975); *United States v. Birnbaum*, 337 F.2d 490 (2d Cir. 1964). For declarations to be admissible under the coconspirator exception, they must further the common objectives of the conspiracy. *United States v. Eubanks, supra.* As the Second Circuit noted in *Birnbaum*,

"[T]he fact that one conspirator tells another something relevant to the conspiracy does not alone make the declaration competent; the declaration must itself be an act in furtherance of the common object; mere conversation between conspirators is not that * * * *."

*United States v. Birnbaum, supra*, 337 F.2d at 495, *citing United States v. Nardone*, 106 F.2d 41, 43 (2d Cir.), *rev'd on other grounds*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

The statement at issue here did not set in motion transactions that were an integral part of the distribution scheme, and did not assist the conspirators in achieving their objectives. *See United States v. Eubanks, supra.* Moreover, the statement was not made to keep either Rosales or the agents abreast of the conspirator's activities, to induce continued participation, or to allay fears. *See United States v. Eaglin*, 571 F.2d 1069 (9th Cir. 1977); *Salazar v. United States*, 405 F.2d 74 (9th Cir. 1968).

In the absence of any evidence that Valasquez's statement was a declaration "in furtherance of" the conspiracy, the statement should not have been admitted under the coconspirator exception to the hearsay rule.