UNITED STATES of America,
Plaintiff-Appellant,

v.

Laurence John LAYTON,
Defendant-Appellee.

No. 82–1072.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 1982.

Decided Aug. 10, 1983.

Certiorari Denied Feb. 27, 1984.
See 104 S.Ct. 1423.

45

Frank J. Marine, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

James F. Hewitt, San Francisco, Cal., for defendant-appellee.

Before WALLACE, KENNEDY, and NELSON, Circuit Judges.

WALLACE, Circuit Judge:

Layton was indicted and tried on four counts arising from the killing of Congressman Leo Ryan and the wounding of Richard Dwyer, Deputy Chief of Mission for the United States in the Republic of Guyana. Layton was charged with (1) conspiracy to murder a Congressman in violation of 18 U.S.C. § 351(d); (2) aiding and abetting the murder of a Congressman in violation of 18 U.S.C. §§ 2, 351(a); (3) conspiracy to murder an internationally protected person (Dwyer) in violation of 18 U.S.C. § 1117; and (4) aiding and abetting the attempted murder of an internationally protected person in violation of 18 U.S.C. §§ 2, 1116(a).

Layton's first trial ended in a hung jury, and the district judge declared a mistrial. Before the second trial, the government moved pursuant to rule 12(d) of the Federal Rules of Criminal Procedure for an order allowing the government to present at retrial certain statements that were ruled inadmissible during the first trial. The excluded statements, which we will analyze in four main categories, were all held inadmissible either as hearsay which did not fall within any exception to the hearsay rule, or as violative of the confrontation clause of the sixth amendment. We reverse as to three categories of evidence and affirm as to one category.

## I

To support its arguments for admitting the evidence, the government was required to present an offer of proof to establish a prima facie case of conspiracy. We refer to this offer of proof for a factual background.

Jim Jones was the leader of the People's Temple, a religious organization composed primarily of American citizens. The People's Temple had a settlement of approximately 1,200 members, known as Jonestown, located in the Republic of Guyana. In response to allegations of poor living conditions in Jonestown and of residents' being detained against their will, Congressman Ryan traveled to Guyana. On November 1, 1978, Ryan advised Jones by telegram of his intended Jonestown visit to conduct an official congressional investigation. A group of relatives of Jonestown residents known as the Concerned Relatives Group planned to accompany Ryan.

Jones discussed Ryan's impending visit in nightly speeches to Jonestown residents gathered at the Jonestown pavilion. Loudspeakers throughout Jonestown enabled anyone to hear Jones expressing hostility and concern about Ryan's expected investigation. He stated that if Ryan came "maybe [his] plane will just fall out of the sky." He also told the residents not to talk to any visitors.

Layton formerly had been a member of the People's Temple security force in the United States. He also was close to the hierarchy of the People's Temple. Layton was observed listening to the broadcasts concerning Ryan's impending visit.

On November 14, the Ryan delegation arrived in Georgetown, Guyana, and after some initial difficulties, Ryan finally obtained permission to visit Jonestown. On Friday, November 17, the Ryan party flew from Georgetown to an airstrip at Port Kaituma, Guyana, about six miles from Jonestown, and then traveled by truck from the airstrip to Jonestown, arriving there later that same day.

Congressman Ryan and members of his party interviewed residents on Friday and Saturday. A number of them, including Monica Bagby, Vern Gosney, and the family of Gerald Parks, decided to leave Jonestown and asked Ryan for his assistance. Jones and members of the Temple's leadership apparently became angered when they learned that some residents intended to leave. Jones attempted to dissuade them and offered Parks $5,000 not to leave.

Jones also expressed concern that people would lie about conditions at Jonestown.

On Saturday afternoon, departing residents and members of the Ryan party assembled at a truck near the pavilion which was to transport them to the Port Kaituma airstrip. About that time, Jones was observed in conversation with Layton, Joe Wilson and another member of the Temple security force. Layton then indicated that he also wished to leave Jonestown, and boarded the truck with the others. Layton's announced defection surprised and concerned some of those who were leaving because they did not trust him, and believed he was feigning defection from Jonestown. Departure for the airstrip was delayed because the truck became stuck in the mud. During the delay, a member of the People's Temple attacked Ryan with a knife. Ryan initially had intended to stay another night to help others who wanted to leave Jonestown, but after the attack he decided to leave immediately.

During the truck ride, one of the Ryan group bumped against Layton to determine whether he was armed, but felt no weapon. As the truck approached the Jonestown gate, Wilson, a member of the Jonestown security force, boarded the truck. He was armed with a revolver. During the trip to the airstrip, Layton talked with Breidenbach, another security force member, who was standing next to him. Crenshaw, who previously had been a security force member, drove the truck to the airstrip.

Congressman Ryan had arranged for two planes, a 19-seat Otter and a 6-seat Cessna, to transport the group from the airstrip to Georgetown. Because the Cessna arrived at the airstrip about 20 minutes before the Otter, part of the delegation boarded the small plane. Layton insisted on traveling in the smaller plane. As Ryan and several others searched those planning to depart, Layton left the line of travelers and boarded the Cessna. Layton was then told to leave the plane and submit to a search. After first falsely claiming that he had already been frisked, he reluctantly complied. Although the search did not reveal any weapons, and he was permitted to reboard the Cessna, Layton somehow ended up with a gun on the airplane. Layton later claimed that he was given the gun by a Temple member named Poncho, but the gun may have been passed to him by Wilson who hugged Layton and put his hand underneath the poncho that Layton was wearing shortly before Layton boarded the plane.

When the Cessna was fully boarded, others were still in the process of boarding the Otter. The Cessna taxied down the runway, preparing to take off. At this point, a tractor-trailer cut in front of the Cessna and moved toward the larger plane. A group of People's Temple members, including Wilson and Breidenbach, began shooting from the tractor-trailer at the larger plane, hitting people inside as well as outside the plane. Congressman Ryan, who was standing outside near the Otter, was among those shot and killed. Other people were wounded; some escaped into the jungle.

The Cessna passengers heard the gunfire. Parks asked the pilot to stop the plane, which was then moving down the runway, and Bagby urged everyone to leave the plane. Layton insisted that the plane take off and then took a revolver from his crotch area and shot Bagby and Gosney two times each. He tried to shoot Parks, but his gun misfired. Parks and Gosney struggled with Layton and disarmed him. The occupants of the smaller plane then escaped into the jungle.

Shortly thereafter, when the survivors began to regroup, Layton denied that he shot anyone and accused Parks of the shooting. Guyanese civilians took Layton to the Guyanese Supernumerary Constable at Port Kaituma, where he stated "I'm glad I shot [them]." On November 22, Layton voluntarily gave a signed, written confession to Guyanese authorities in which he stated:

I, Larry Larry [sic] Layton, take full responsibility for all the deaths and injuries that took place at the Port Kaituma airstrip.

I had begged the Bishop Jim Jones that I be allowed to bring down the plane, but he disapproved. My reason for suggesting that was because I felt that these people were working in conjunction with the CIA to smear the People's Temple and to smear Guyana. I got a gun from a friend of mine, one Poncho, and I went to the airstrip intending to bring down the plane. But when the shooting started, I also started shooting as I thought it was all too late. I don't know why I did it.

Based on the offer of proof, the district judge ruled that the government had presented sufficient evidence to establish a prima facie case of a conspiracy to kill Congressman Ryan. We agree. Nevertheless, he excluded the contested evidence as hearsay or violative of the confrontation clause. The excluded evidence includes: (1) tape-recorded statements by Jones to members of the People's Temple prior to the arrival of the Ryan party; (2) statements made by Jones to Charles Garry, his attorney, shortly after the Ryan party left Jonestown for the airstrip; (3) Jones's tape-recorded statements, referred to as the "Last Hour Tape"; and (4) statements made after the shooting by People's Temple member Carter to Parks. In denying the government's Federal Rules of Criminal Procedure rule 12(d) motion, the district court excluded five categories of evidence from the retrial, but the government contests on appeal the exclusion of only these four categories.

## II

The unique procedural posture of this case raises two jurisdictional questions of first impression in this circuit: (1) Was the district court correct in ruling on the government's motion prior to rather than during trial? (2) Do we have appellate jurisdiction to review the district court's interlocutory order? Although these issues were not argued or briefed by the parties, we are obliged to notice want of jurisdiction on our own motion. *Mansfield, Coldwater & Lake Michigan Railway v. Swan,* 111 U.S. 379, 382–86, 4 S.Ct. 510, 511–13, 28 L.Ed. 462 (1884); Fed.R.Civ.P. 12(h)(3).

### A.

■ The district judge's duty in deciding when to rule on permissive pretrial motions is governed by rule 12(e) of the Federal Rules of Criminal Procedure.[1] Ordinarily, a district court's decision whether or not to hear a motion pretrial will be reversed only if there has been an abuse of discretion. *United States v. Abraham,* 541 F.2d 624, 626 (6th Cir.1976). We apply that test here.

■ In deciding whether to hear a motion before trial, the district judge must balance a desire to preserve the government's right of appeal against the inefficiency created by conducting a mini-trial before the actual trial. Here, the district judge did not abuse his discretion. There has already been a trial, and the government and defense plan to use the same evidence in the second trial. The retrial will not differ from the first trial in any significant respect and, therefore, there is little inefficiency to balance against the desire to preserve the government's appeal.

### B.

■ The second issue is whether the order excluding the government's proposed evidence is appealable pursuant to 18 U.S.C. § 3731.[2] Due to the posture of this case,

---

1. Rule 12(e) states that:

 A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected.

2. 18 U.S.C. § 3731 states in part:

 An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and

the issue is narrow: after all evidence is presented and a mistrial has been granted, may the government, prior to a second trial, appeal from the denial of a pretrial motion to admit certain evidence which had been ruled inadmissible at the original trial?

The three preliminary section 3731 jurisdictional requirements established by the Supreme Court, *United States v. Helstoski,* 442 U.S. 477, 487 n. 6, 99 S.Ct. 2432, 2439 n. 6, 61 L.Ed.2d 12 (1979), have been met in the present case. As to the additional requirements, *United States v. Booth,* 669 F.2d 1231, 1241 (9th Cir.1981); *United States v. Loud Hawk,* 628 F.2d 1139, 1150 (9th Cir.1979) (en banc), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980), the only questionable issue is whether Layton has been placed in jeopardy before the appeal.

The Supreme Court has stated that the purpose of section 3731 is "to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Helstoski,* 442 U.S. at 487 n. 6, 99 S.Ct. at 2439 n. 6, *quoting United States v. Wilson,* 420 U.S. 332, 337, 95 S.Ct. 1013, 1018–1019, 43 L.Ed.2d 232 (1975); *United States v. Dahlstrum,* 655 F.2d 971, 973–74 (9th Cir. 1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *United States v. Humphries,* 636 F.2d 1172, 1175 (9th Cir. 1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981); *United States v. Hetrick,* 644 F.2d 752, 755 (9th Cir.1980). Thus, the term "jeopardy" as used in the statute is coextensive with the definition of jeopardy under the double jeopardy clause of the Constitution. It has long been established that the double jeopardy clause does not prevent retrial of a criminal defendant following a mistrial due to a hung jury. *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). Moreover, under the statute, the general rule is that jeopardy does not at-

tach in the second trial until the jury has been sworn. *See United States v. Jorn,* 400 U.S. 470, 477–78, 91 S.Ct. 547, 553, 27 L.Ed.2d 543 (1971) (plurality opinion) (applying earlier version of § 3731), *overruled on other grounds, Oregon v. Kennedy,* 456 U.S. at 672–78, 102 S.Ct. at 2088–91; 15 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure,* § 3919 at 676 (1976); *accord United States v. Margiotta,* 662 F.2d 131, 141 & n. 26 (2d Cir.1981). Thus, this appeal meets the requirements under our interpretation of section 3731 and we have jurisdiction.

### III

Ruling on the evidentiary questions is easier after we analyze the government's theory of the case and its purpose for introducing the statements. The district judge ruled that the government's offer of proof was sufficient to establish a prima facie case of a conspiracy to kill Congressman Ryan and of Layton's involvement as a participant. His ruling was based on the apparent planning for and coordination of the events at the airstrip: Layton fired the gun in the small plane immediately after the other Temple members fired on part of the Ryan party on and near the large plane; Layton was involved in a discussion with Jones just before the Ryan group left for the airstrip; Layton feigned defection; at the airstrip Layton talked to Wilson, a member of the group in the truck that killed Ryan; and apparently a gun was passed to Layton by another Temple member. This evidence was held sufficient to raise a reasonable inference that Layton had entered into an agreement to kill not only the defectors, but Ryan and Dwyer as well. The government offers the various statements by Jones and Temple member Carter to help substantiate its case that Jones, Layton, and other Temple members reached an agreement to kill Congressman Ryan prior to the time the truck left for the

that the evidence is a substantial proof of a fact material in the proceeding.

The appeal in all such cases shall be taken within thirty days after the decision, judg-

ment or order has been rendered and shall be diligently prosecuted.

airstrip and even prior to Ryan's arrival at Jonestown. If Jones is a member of the conspiracy, his statements in furtherance of the conspiracy would ordinarily be admissible.

### A.

The first of the four categories of excluded evidence includes tape-recorded statements made by Jones in speeches to members of the People's Temple prior to the arrival of the Ryan party. The speeches indicate that Jones believed that the Ryan delegation was hostile to the People's Temple movement and that they had lied about the Jonestown community. At one point Jones stated:

> Here comes this man into our community ... [on a] commercial plane, which will be easier to handle ... and everyone needs to be where they belong, day or night, because these are serious people .... These people intend to do anything possible to destroy. Fortunately, we know most of their plans.[3]

The tapes also indicate Jones's desire to kill Congressman Ryan. In another part of the same speech, he said, "if they enter this property illegally, they will not leave it alive." This statement was followed by loud applause. In another pre-arrival speech Jones stated:

> I can assure you that if he [Congressman Ryan] stays long enough for tea he's going to regret it.... If he comes out here he say we're brainwashed. Or we're spaced out ... so I don't think you can win with these sons of bitches ... I want to shoot someone in the ass like him so bad, so long, I'm, I'm not passing this opportunity up. Now if they come in, they come in, they come in on their own risk. That's what I figure.

Jones continually urged his followers not to talk to the Congressman's party and not to return with them to the United States. Throughout his speeches, the crowd applauded and shouted encouragement to Jones.

■ The government offers these statements as evidence of Jones's participation in the conspiracy and his intent to kill Congressman Ryan. They are material because an unlawful intent of the conspirators is an element of a conspiracy case. *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir.1980); W. LaFave & A. Scott, *Handbook on Criminal Law* § 61 at 454–55 (1972). Although the statements are clearly hearsay, the government argues that they should be admitted under one of three theories: as the statements of a co-conspirator, Fed.R.Evid. 801(d)(2)(E), as falling within the state of mind exception to the hearsay rule, Fed.R.Evid. 803(3), or as nonassertive conduct. The district court rejected all three arguments and excluded the evidence. We find that, provided sufficient evidence exists to raise a reasonable inference of conspiracy at the time Jones made the statements, the evidence is admissible under the co-conspirator exception to the rule. We therefore need not reach the government's other arguments.

■ Before admitting a statement of a co-conspirator into evidence against a defendant, the court must have independent evidence of the existence of the conspiracy and of the defendant's connection to it, and must conclude that the statement was made both during and in furtherance of the conspiracy. *United States v. Sears*, 663 F.2d 896, 905 (9th Cir.1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982); *United States v. Mason*, 658 F.2d 1263, 1269 (9th Cir.1981). As to the latter two requirements, "[s]ufficient evidence [must] exist to support an inference that the statements were made in furtherance of the conspiracy, while the conspiracy was in existence...." *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir.1981) (*Fielding*), *quoting United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir.1979) (per curiam) (*Eubanks*). The district court found that Jones's statements were not "in furtherance of" any conspir-

---

**3.** Jones also stated "if we have to kill some of them and even some of the children, it's worthwhile to save other children. Makes no difference how many we have to kill, we will kill to destroy." Taken in context, it does not appear that Jones intended to kill any children.

**556**

acy, and excluded the evidence. We need not decide under which standard to review the district court's finding because we conclude that under any standard the court erred in concluding that the statements were not "in furtherance of" a conspiracy.[4]

 We have, on many occasions, sought to define the "in furtherance of" requirement. We have stated that "mere conversations between co-conspirators" or "merely narrative declarations" are not admissible as statements in furtherance of a conspiracy. *Fielding,* 645 F.2d at 726; *Eubanks,* 591 F.2d at 520. Instead, the statements must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." *Id.* In short, they must assist the conspirators in achieving their objectives. Although statements designed to induce a listener to join a conspiracy are admissible, mere "casual admission[s] of culpability to someone [the declarant has] individually decided to trust" are not admissible. *Fielding,* 645 F.2d at 726, *quoting United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976); *United States v. Castillo,* 615 F.2d 878, 883 (9th Cir.1980) (*Castillo*); *Eubanks,* 591 F.2d at 520.

 In *Eubanks,* for example, we disallowed statements made by a co-conspirator to his common law wife that he was going to Tucson to buy narcotics and that people he had spoken with over the telephone also were involved in the conspiracy plans.

There was no evidence that he was attempting to induce his wife to join the conspiracy or that the statements in any way furthered the objectives of the conspiracy. *Id.* Likewise, in *Castillo,* we concluded that a statement by a co-conspirator to a fellow inmate that he and the defendant were "fixing to kill a Mexican" was not admissible. The statement was not intended to further the conspiracy but was merely a casual admission to someone the conspirator had decided to trust. 615 F.2d at 882–83; *see also United States v. Traylor,* 656 F.2d 1326, 1332 (9th Cir.1981). Such cases must be distinguished from a situation in which a co-conspirator informs another person of his criminal activities with the intent of enlisting the latter's participation in the conspiracy, *see, e.g., United States v. Dorn,* 561 F.2d 1252, 1256–57 (7th Cir.1977) (per curiam), *overruled on other grounds, United States v. Read,* 658 F.2d 1225, 1236 n. 6 (7th Cir.1981), or when such a discussion prompts action in furtherance of the conspiracy by either of the participants to the conversation. *See United States v. Kendall,* 665 F.2d 126, 133 (7th Cir.1981). Thus, rule 801(d)(2)(E) is designed "to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." 561 F.2d at 1256, *quoting* 4 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 801(d)(2)(E)[01] at 801–171 (1981) (Weinstein's Evidence).

 On the other hand, if the statements advance the objectives of the conspiracy, they will be admitted.[5] Weinstein's Evi-

---

4. The government argues that we should apply a de novo standard, citing *United States v. Rosales,* 584 F.2d 870 (9th Cir.1978). In *Rosales,* we stated that the issue whether the government has established a prima facie case of conspiracy in its offer of proof is a legal question which we will review de novo. *Id.* at 872. The establishment of a prima facie case, however, is distinguishable from the purely evidentiary question of whether statements can be said to "further" a conspiracy. At least two of our cases indicate that the trial court's "in furtherance of" finding is to be accorded at least some deference. *See United States v. Sandoval-Villalvazo,* 620 F.2d 744, 747 (9th Cir. 1980); *Salazar v. United States,* 405 F.2d 74, 74 (9th Cir.1968) (per curiam). We find it unnec-

essary in this case to determine exactly what degree of deference the district court is owed.

5. The cases cited in this section indicate that courts sometimes focus on the speaker's intent in making the statements and sometimes on their probable effect. Thus, courts have applied both a prospective, scienter analysis and a retrospective, objective analysis. The relationship between these two analyses is unclear. Statements made with the intent of furthering the conspiracy will undoubtedly be admitted whether or not they result in any benefit to the conspiracy. On the other hand, it is unclear whether a statement which was not intended to further the conspiracy, but which in fact furthers or is likely to further the conspiratorial

dence, ¶ 801(d)(2)(E)[01] at 801–174 ("Whether a particular statement tends to advance the objectives of the conspiracy can only be determined by the examination of the context in which it is made."). For example, in cases involving a conspiracy to sell drugs, we have approved admission into evidence of statements made to reassure the buyer that the conspiracy is still in effect and to prevent him from leaving before the sale is made. *United States v. Mason,* 658 F.2d at 1270; *United States v. Sandoval-Villalvazo,* 620 F.2d 744, 747 (9th Cir.1980); *Salazar v. United States,* 405 F.2d 74, 74 (9th Cir.1968) (per curiam). In *Eubanks,* an order from one conspirator to another to stop using heroin so that he would be "cleaned up" enough to distribute the drug, and statements involving the actual negotiation of a sale were held to be in furtherance of the conspiracy. 591 F.2d at 520. A statement to someone to secure utensils and mixing bowls for the mixing of drugs is sufficiently in furtherance of a conspiracy to sell drugs, even if the person ordered to obtain the materials was not part of the conspiracy. *United States v. Traylor,* 656 F.2d at 1333. Finally, we have held that statements made to keep a conspirator abreast of a co-conspirator's activities, or to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator are in furtherance of a conspiracy. *United States v. Eaglin,* 571 F.2d 1069, 1083 (9th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978).

A recent illustration of the reach of the co-conspirator exception is *United States v. Sears.* The defendant and his co-conspirators induced a woman that the defendant knew to let them use her house after a bank robbery to shower and dispose of disguises. 663 F.2d at 899, 905. While they were at her house, one of the conspirators gave a detailed account of the bank robbery to the woman and her husband. We held that the statements furthered the conspiracy by dissuading the woman and her husband from calling the police because of the robbers' implicit threats and because of their fear of being charged with aiding and abetting a robbery. Thus, the statements furthered the conspiracy's objectives of robbing the bank and escaping safely. *Id.* at 905.

The basis of the district court's holding in the case before us was not that there was a lack of prima facie proof of a conspiracy extant at the time of Jones's statements, but rather that the statements did not further any conspiracy to kill Congressman Ryan or members of his party. He concluded that they were mere conversations, narrative declarations or casual admissions of culpability. We disagree. The statements were not narrations of past events, but expressions of future criminal intent. They may be excluded only if they did not further the objectives of the conspiracy.

Under any standard of review,[6] the district court erred in excluding the statements on the ground that did not satisfy the "in furtherance of" requirement. The context of Jones's statements supports an inference that they were made in furtherance of the conspiracy. Jones made these statements before a large crowd of Temple members over whom he exerted enormous influence. The statements informed Temple members of Ryan's arrival, intimated that Jones had spies among Ryan's party, and expressed Jones's desire "to shoot someone ... like him." The statements were the rallying cries of a charismatic leader to his devoted followers. In all likelihood, Jones's statements both had the effect of and were intended to enlist the crowd into compliance with the imminent murder of Ryan and to bolster the resolve of any in the audience who might already have agreed to help.[7] Thus, if a conspiracy already existed to murder Ryan, then the statements were made in furtherance of it,

objectives, would be admissible. We need not resolve this issue because we conclude that Jones's statements were not only likely to advance the conspiracy, but that they were made with the intention of doing so.

**6.** *See* footnote 4, *supra.*

**7.** *See* footnote 5, *supra.*

*United States v. Eaglin,* and are distinguishable from the casual admissions excluded in *United States v. Castillo.*

██ Layton argues that the district judge only ruled that there was sufficient evidence to raise a reasonable inference of a conspiracy at the airstrip, not before. Therefore, he argues, Jones's statements were not made during the pendency of the conspiracy, but before its inception. In two different places in the record, however, the district judge explicitly stated that there was enough evidence to establish a prima facie case, mainly pointing out that the coordinated events at the airstrip could not have been a mere coincidence. There is no basis in the record to support a theory that such coordination occurred spontaneously. Thus, the agreement must have been reached before the events at the airstrip. It is unclear, however, whether the district court found the offer of proof sufficient to allow a reasonable inference that a conspiracy existed at the time of Jones's statements. If, on remand, the district court determines that the evidence is sufficient to make such a finding, the statements must be admitted under the co-conspirator exception to the hearsay rule.

Although the district judge considered possible sixth amendment confrontation clause problems in connection with some of the other evidentiary questions, he did not analyze the confrontation question in relation to Jones's remarks before the Ryan party arrived. We therefore do not pass on that issue.

### B.

The government also seeks the admission of testimony by Garry, Jones's lawyer, that shortly after the Ryan party left for the airstrip Jones told him that Layton and Parks had taken all the weapons from Jonestown and were proceeding to the airstrip to engage in violent acts; that all was lost at that time; that Layton was not a defector, but was going to the airstrip to carry out a mission of violence. Although the statements are clearly hearsay, the government argues that the statements are admissible as a declaration against Jones's penal interest and therefore admissible under rule 804(b)(3) of the Federal Rules of Evidence.[8] "The standard for appellate review of a decision to exclude a hearsay statement under Rule 804(b)(3) is whether the trial court abused its discretion." *United States v. Satterfield,* 572 F.2d 687, 690 (9th Cir.1978), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978) (*Satterfield*).

We have discussed the application of rule 804(b)(3) several times, but in each case we have considered only statements of a declarant which were offered to *exculpate* a defendant. *See United States v. Poland,* 659 F.2d 884 (9th Cir.1981) (per curiam), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981) (*Poland*); *United States v. Hoyos,* 573 F.2d 1111 (9th Cir.1978) (*Hoyos*); *Satterfield; United States v. Benveniste,* 564 F.2d 335 (9th Cir.1977) (*Benveniste*); *United States v. Oropeza,* 564 F.2d 316 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). In this case, Jones's statements are offered to *inculpate* Layton. Although the application of 804(b)(3) to inculpatory statements has been analyzed by other circuits,[9]

---

8. Federal Rule of Evidence 804 states in part: *(b) Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

 . . . . .

 (3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

9. *See, e.g., United States v. Riley,* 657 F.2d 1377, 1381–84 (8th Cir.1981); *United States v. Palumbo,* 639 F.2d 123, 127–28, 129–34 (3d Cir.1981) (opinions of the court and Adams, J., concurring), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States*

we apparently have not faced the issue in this circuit.

■ It is clear from the language of rule 804(b)(3) that three requirements must be met before evidence is admissible as a declaration against penal interest when the declaration is being offered to exculpate a defendant: (1) the declarant must be unavailable, (2) the statement must tend to subject the declarant to criminal liability such that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true, and (3) there must be corroborating circumstances which indicate the trustworthiness of the statement. *Hoyos,* 573 F.2d at 1115; *Satterfield,* 572 F.2d at 691; *Benveniste,* 564 F.2d at 341. It is clear that the first two factors are also required when evidence is offered to inculpate a defendant. We have not passed upon whether the third requirement only applies to exculpatory statements. *See United States v. Palumbo,* 639 F.2d 123, 129–30 (3d Cir.1981) (Adams, J., concurring) (reviewing legislative history), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); Comment, *Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest,* 66 Calif.L.Rev. 1189, 1191–98 (1978); Fed.R.Evid. 804(b)(4) advisory committee note (1971 Draft), *reprinted in* 51 F.R.D. 315, 438–39, 443–44 (1971). We need not reach the question here because we conclude that the third, as well as the first two requirements have been met.

■ The unavailability requirement is met because Jones is dead. The district judge disallowed Jones's statements to Garry because the statements were not sufficiently against Jones's penal interest and because they did not meet the statutory standard of trustworthiness. He gave two reasons for his decision. First, he pointed out that Jones's statements were to his attorney. Because of this, he concluded,

Jones would presumably be more outspoken and might make potentially incriminating statements without being entirely certain that the statements were true. The court stated that "in speaking to the attorney, the client might wish to paint the darkest possible picture of potential liability, in order to be advised as to the worst consequences that might follow." Thus, he might not have been as careful to verify his statements as he would if he were not speaking to his attorney.

■ We find this reasoning unpersuasive. If anything, statements made to an attorney are likely to be more reliable in that they might be more candid. Moreover, the circumstances of this case do not suggest the normal consultation between a lawyer and his client. Finally, as we discuss later, Jones's statements to Garry regarding Layton were subsequently corroborated. Under these circumstances, we do not believe that because Jones made the statements to his attorney they are not trustworthy.

■ Second, the district judge emphasized that the statements were not clearly against Jones's penal interest. He stated that the statements generally do not implicate Jones in the violence that is about to take place at the airstrip. Instead, the remarks tend to inculpate other members of the People's Temple. Thus, the district judge suggests that Jones had an incentive to misrepresent the events at the airstrip and to divert guilt away from himself and on to other members of the Temple.

We disagree. In interpreting the "against interest" requirement, we have often stated that Congress's use of the phrase "tend to subject" illustrates its desire that this type of evidence be freely admissible. *Satterfield,* 572 F.2d at 691; *Benveniste,* 564 F.2d at 341. Thus, we have held that rule 804(b)(3) is not limited to confessions of criminal responsibility, *id.,* although the

*v. Garris,* 616 F.2d 626, 631–33 (2d Cir.1980), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3021, 65 L.Ed.2d 1119 (1980); *United States v. Love,* 592 F.2d 1022, 1025–26 (8th Cir.1979); *United States v. Alvarez,* 584 F.2d 694, 700–02 (5th Cir.1978); *United States v. Bailey,* 581 F.2d 341, 345 n. 4 (3d Cir.1978); *see also United States v. Turner,* 475 F.Supp. 194, 196–98 (E.D. Mich.1978) (mem.).

statements must, in a real and tangible way, subject declarants to criminal liability. *Hoyos,* 573 F.2d at 1115. Here, Jones indicated that he had detailed knowledge of events that were about to transpire. Because Jones had control over most events in Jonestown, he would have known that acts of his followers, especially his security force, would be attributed to him. He already had indicated a desire to kill Ryan. Given these circumstances, Jones's remarks would tend to subject him to criminal responsibility for both the murder and participation in a conspiracy to murder Congressman Ryan. We have held that remarks that tend to implicate the declarant in a conspiracy are statements against his penal interest. *See Benveniste,* 564 F.2d at 341. It is inconceivable that, had Jones lived and been charged with conspiracy to murder, these statements would not have been admissible against him. It should not make any difference in the "against interest" finding that the statements are offered against Layton rather than Jones. We conclude that these statements clearly are against Jones's penal interest.[10]

 Turning from the second requirement that the statements be against penal interest to the third requirement, the corroborating evidence and the circumstances surrounding the statements establish their trustworthiness. The violence at the air-

strip took place exactly as Jones said it would. At the time Jones talked to Garry, the group was on its way to the airstrip. Layton was pretending to be a defector just as Jones had said. He was part of coordinated activity to shoot people in both airplanes. Testimony by several eyewitnesses and Layton's own confession established these facts. Such corroboration underscores the reliability of Jones's statements.

The evidence does not suggest that Jones was trying to divert guilt from himself. Later, in the "last hour" speech, Jones said that although he did not pull the trigger, he took responsibility for the murders. Furthermore, Jones's statements to Garry were not made while in custody to curry favor with the police. They were spontaneous statements made to a trusted advisor and were made as the events were occurring or about to occur. These factors all indicate that the statements were trustworthy.

In conclusion, we hold that Jones's statements to Garry were admissible as statements against Jones's penal interest. As the district judge pointed out, the coordinated activities at the airstrip created a reasonable inference that a conspiracy existed. Jones's statements clearly implicate him as a member of that conspiracy and therefore are against his penal interest. We need not reach the question of whether

10. Layton refers us to language in *United States v. Poland,* 659 F.2d 884 (9th Cir.1981) (per curiam) (*Poland*), in which we stated that:

> The statement of Sylvia was not a confession of any crime by her, nor did she say that she actually did anything criminal. She was present at planning. Her statement is that of an observer, not a participant. On the basis of her statement, the *most* that she did was to conspire and there is little evidence of that.

*Id.* at 895 (emphasis in original).

This passage should not be interpreted to imply that statements against penal interest are not admissible if they only tend to subject the declarant to a charge of conspiracy. Indeed, in many cases a declaration against interest will be admissible because it shows the declarant's knowledge of a crime which in turn would tend to subject him to liability for conspiracy.

Moreover, *Poland* is clearly distinguishable. First, the facts show that the declarant in *Poland* was a mere observer, and had no knowl-

edge of the object of the conspiracy. Second, *Poland* rests more on the lack of corroborating evidence rather than on a finding that the statements were not against penal interest. Although we stated that the declarant's statement was not "solidly inculpatory," we concluded our analysis by stating: "[b]ecause there is not only an absence of corroboration but also positive evidence that further shows untrustworthiness ... we conclude that no abuse of discretion is shown in the ruling made." *Id.* at 895.

Jones's statements are more similar to those in *United States v. Benveniste,* 564 F.2d 335 (9th Cir.1977), in which we stated:

> Meek's statements to LaJeunesse implicate her as a key participant in a major drug sale negotiation. If Meek had been charged with conspiracy to sell cocaine her statements would show she knowingly played an active role in bringing Tabb, Wyman and appellant together and that she had detailed and intimate knowledge of the transaction.

*Id.* at 341.

trustworthiness is a requirement for admissibility of inculpatory statements because in this case the record demonstrates they were trustworthy.

■ In this second category of statements, as distinguished from the first, the district court did determine that admission of the statements violated the sixth amendment confrontation clause. "[C]onfrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony." *United States v. Perez,* 658 F.2d 654, 660 (9th Cir.1981) (*Perez*); *accord Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–2539, 65 L.Ed.2d 597 (1980). Here, the necessity for using Jones's out-of-court statements is clear. Jones is dead. In determining reliability, the district judge used the four-part *Dutton* test. *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219–220, 27 L.Ed.2d 213 (1970) (plurality opinion) (*Dutton*).

Before turning to the *Dutton* analysis, however, we must first dispose of a preliminary issue. The government argues that mere satisfaction of requirements for the against penal interest exception automatically eliminates all possible confrontation clause infirmities. We have previously rejected that argument in regard to the co-conspirator exception. *United States v. Fleishman,* 684 F.2d 1329, 1339 (9th Cir. 1982) (*Fleishman*); *Perez,* 658 F.2d at 660 & n. 5; *United States v. Snow,* 521 F.2d 730, 734 (9th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976), *overruled on other grounds, United States v. Fielding,* 630 F.2d 1357, 1367 n. 11 (9th Cir.1980). Instead, we have, as the district judge did in this case, used the four-part test set out by a plurality of the Supreme Court in *Dutton.* Because we find that admission of these statements does not violate the confrontation clause under the *Dutton* analysis, we need not decide whether statements admissible under the against penal interest exception automatically meet the requirements of the confrontation clause.

We have considered two factors especially important in establishing reliability under the *Dutton* test. They are relevant to this case. First, and most important, the existence of corroborating evidence for the contested statements is a very strong indicator that the statements are reliable. *See Fleishman,* 684 F.2d at 1340; *Perez,* 658 F.2d at 662; *United States v. Rosales,* 606 F.2d 888, 889 & n. 1 (9th Cir.1979) (per curiam); *United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir.1979) (per curiam); *United States v. Snow,* 521 F.2d at 734–35. Second, we have emphasized that a statement against one's penal interest suggests that the defendant has not misrepresented his part in the crime. *Perez,* 658 F.2d at 662; *United States v. Snow,* 521 F.2d at 735. In fact, in *Dutton* itself, the Supreme Court pointed out that the statement was made spontaneously and against the defendant's penal interest, and therefore satisfied the fourth requirement under the test. 400 U.S. at 89, 91 S.Ct. at 220.

We conclude that the district judge erred when he held that admitting Jones's statements to Garry into evidence would be a violation of Layton's rights under the confrontation clause. Although Jones's statements to Garry contained some factual errors, the statements are reliable insofar as they show Jones's awareness of and cooperation with events at the airstrip. His statements were corroborated by subsequent events. His statements were also against his penal interest and do not seem designed to cast blame on Layton. Neither the statements themselves nor their immediate context demonstrate inherent unreliability. Indeed, the statements were made to Jones's lawyer—a situation suggestive of reliability.

### C.

The government seeks to admit a number of statements made by Jones which are recorded on the "Last Hour Tape," made just before and during the mass suicide at Jonestown. Some of the statements appear to have been made before and some after Jones received word from the airstrip that the shootings had occurred.

The former statements include the following:

> One of the people on that plane is gonna ... shoot the pilot. I know that ... and down comes that plane in the jungle.... There's one man there who blames, and rightfully so, Debbie Blakey, ... for the murder of his mother and he'll sh—he'll stop that pilot by any means necessary. He'll do it. That plane will come out of the air. There's no way you can fly a plane without a pilot.

The statements which seem to have been made after the word of the shootings reached Jones include the following:

> The congressman's dead, the congressman lays dead, many of our traitors are dead, they're all laying out there dead ... I didn't but, but my people did. My people did. They're my people.... I don't know who fired the shot, I don't know who killed the Congressman. But as far as I'm concerned, I killed him. You understand what I'm saying. He had no business coming. I told him not to come.

■ The government offered seven different theories supporting admissibility of these statements. Significantly, the district judge held that the statements were declarations against penal interest. He nevertheless excluded the evidence because he found that admission of the statements would violate the confrontation clause. Because the district judge did not abuse his discretion in holding that the statements are declarations against Jones's penal interests, we need analyze only the confrontation clause issue.

■ The district judge emphasized again that the statements were made while Jones was in a highly agitated, irrational state. He points particularly to the statement "I don't know who killed the Congressman. But as far as I'm concerned, I killed him." This, he stated, may indicate the ravings of a madman who may be merely asserting an identification with the killers on a mystical, bizarre level. Thus, it would be essential to have the declarant available to be cross-examined to ascertain whether or not the statements were accurate.

Under the *Dutton* analysis, we hold that the statements are not so inherently untrustworthy that they must be excluded. The key questions are whether Jones had personal knowledge of the events and whether or not his statements might have resulted from a faulty memory. *Dutton,* 400 U.S. at 88–89, 91 S.Ct. at 219–20; *Perez,* 658 F.2d at 661–62; *United States v. Snow,* 521 F.2d at 734–35. The district judge appears to have equated irrational behavior with an inability to have personal knowledge or a correct memory of events. Jones does appear to have had detailed personal knowledge of the events that were about to occur at the airstrip and his statements are fully corroborated by the events that took place. For example, he said that one of his people would shoot the pilot; Layton's apparent role in the murders at the airstrip was to shoot the pilot.[11] His earlier statements to Garry indicate his knowledge of Layton's feigned defection, another key link in the events at the airstrip.

Furthermore, the subsequent statements were made soon after the events. There is very little likelihood that Jones's memory would be faulty at that point. Merely because a person is somewhat irrational, or highly agitated, does not mean that he cannot relate events that have occurred recently or have personal knowledge of events about to take place. Furthermore, because Jones's statements are tape recorded, the jury will be in a better than usual position to judge Jones's mental condition when he made the statements. Although this is not as effective as cross-examination, it does

---

11. Jones's reference to Debbie Blakey in the passage quoted in the text indicates that he was referring to Layton as the person who would shoot the pilot. Blakey was Layton's sister and apparently Layton blamed her for his mother's death. Thus, Jones seems to have believed that Layton's part in the events at the airstrip was to shoot the pilot, a belief that is corroborated by Layton's insistence on being seated on the small plane, his smuggling a gun aboard the plane, and his seating himself directly behind the pilot.

mitigate the dangers involved in admitting the statements. We conclude that the statements made as part of the "last hour" speech should be admitted into evidence.

### D.

The government seeks to admit statements made by Temple member Carter to Parks on the day of the shootings, after Layton had been taken into custody. Carter told Parks that Jones had sent him to the San Francisco Bay area to infiltrate the Concerned Relatives Group as a feigned defector in order to determine who was coming to Jonestown with Congressman Ryan and the purpose of their trip. The government offers the statements on the theory that they were against Carter's penal interest. The district judge excluded the statements because he found that they were not solidly against Carter's penal interest and that their admission would violate the confrontation clause. The court also stated that the government might have a problem meeting the unavailability requirement under both the hearsay exception and the confrontation clause, because Carter has not taken the fifth amendment, but merely has indicated that he will invoke the privilege against self-incrimination if called upon to testify. We hold that the district judge did not abuse his discretion in finding that the statements were not sufficiently against Carter's penal interest, and therefore need not reach the unavailability question under either the hearsay exception or the confrontation clause.

The government argues that Carter's infiltration was the first link in a chain that ended with the murder of Congressman Ryan. It alleges that Carter provided Jones with information that the Ryan delegation was hostile and had to be silenced. Thus, the statements were against Carter's penal interest in that they implicated him in the conspiracy to murder Ryan. Furthermore, the government argues that the statements were made directly after the killings when Carter would suspect that an investigation would be focusing on all the events leading up to the murders. Therefore, a reasonable person would know that such statements were against his penal interest and would not make them unless he knew them to be true.

We find the government's argument persuasive to some extent. Because the statements are being used only against Carter and not to exculpate or inculpate a third person, we must ask only whether Carter's statements "tend to subject" him to criminal liability. We have stated that an invocation of the fifth amendment is evidence that statements are against the declarant's penal interest. *Benveniste,* 564 F.2d at 341. On the other hand, in many ways the statements were not solidly inculpatory. Unlike the statements Jones made to Garry, these statements did not show that Carter had detailed knowledge of the conspiracy to kill Ryan. The infiltration of the Concerned Relatives Group was not itself a crime and does not automatically suggest that there was a connection between the infiltration and the later conspiracy to murder Congressman Ryan. Carter's infiltration was too remote from the events at Jonestown to make his statements solidly inculpatory.

Thus, there are good arguments on both sides of this question. Our task, however, is not to decide rulings de novo but to determine whether the district judge abused his discretion. We cannot say that his resolution of this question amounted to an abuse of discretion. Therefore, we affirm the district judge's exclusion of the statements made by Carter to Parks.

### IV

Layton argues that regardless of our rulings on the specific evidentiary questions before us and the confrontation clause, the district court's rulings must be sustained because the evidence was properly excluded as too prejudicial and confusing under Federal Rule of Evidence 403. Because he excluded the proffered evidence on other grounds, the district judge did not reach the rule 403 question. The issue is therefore not before us on appeal. The district judge is, of course, free to rule on Layton's rule 403 motion on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.