UNITED STATES of America

v.

Alexander Eugenio MOSKOVITS.

Crim. No. 87–284–01.

United States District Court,
E.D. Pennsylvania.

Aug. 28, 1991.

Kristin R. Hayes, Asst. U.S. Atty., for U.S.

William M. Kunstler, New York City, for defendant.

## BENCH OPINION *

LOUIS H. POLLAK, District Judge.

In September of 1988, I sentenced Mr. Moskovits to a period of incarceration of seventeen years. Ten years of that sentence was on Count 8 of the indictment, which alleged possession with intent to distribute a cocaine-containing substance which was over 500 grams.

Under the statutory scheme, conviction on that count called for a mandatory sentence of five years as a minimum. The mandatory minimum under that statute is increased to ten years, where the person convicted has had a previous felony drug conviction under federal or state or foreign law. The statutory procedure requires the government, if it feels such enhancement is called for in the particular case, to advise the defense at an appropriately early date of the prior conviction or convictions to be relied on as generating enhancement.

In this case, such notice was given to the defense. The defense was apprised that the government would ask for enhance-

ment on the basis of Mr. Moskovits' conviction in Mexico, in 1983, of the offense of importing narcotic drugs into Mexico.

That offense was one with respect to which Mr. Moskovits was arrested on June 29, 1983, while arriving in Mexico by air, and he was found guilty and sentenced to a period of seven years in custody on September 20, 1983.

Thereafter, pursuant to the Mexican/U.S. Prisoner Exchange Treaty, Mr. Moskovits was transferred to a U.S. prison, and served out the balance of his term. It was after release on the Mexican term from U.S. custody, that Mr. Moskovits was subsequently charged with, and ultimately convicted of, the several crimes, including the particular count which is in question here today, that is the focus of our attention.

The conviction—Mr. Moskovits was in this court—was sustained by the Court of Appeals. Subsequently, Mr. Moskovits filed various motions which were aggregated and consolidated in the 2255 motion now before this court.

The central contention made on Mr. Moskovits' behalf, is that the Mexican conviction, which was the basis for enhancement—that is to say my decision that a mandatory minimum sentence of ten years was called for on Count 8—was an invalid conviction because it was the result of procedures which are not consonant with American constitutional requirements, and hence would not form the basis of sentence enhancement in this United States court.

The core of defendant's contention is that the Mexican proceedings were invalid because Mr. Moskovits did not have counsel at crucial phases of the proceeding. The first question to be addressed is whether the contention made by Mr. Moskovits comes too late. Has Mr. Moskovits had his opportunity to make this objection, and foregone that opportunity?

The Court of Appeals affirmed Mr. Moskovits' conviction in an opinion, not for

---

* This bench opinion was originally delivered on August 21, 1991, and was filed on August 28, 1991. It has been edited by the writer very slightly to improve intelligibility.

publication, that was filed on April 13, 1989. There, the Court of Appeals said:

Appellant first argues that the ten-year mandatory minimum sentence imposed by the district court following his conviction for possession with the intent to distribute cocaine must be vacated because the district court did not comply with the provisions of 21 U.S.C. § 851(b). Section 851(b) requires the district court to ask a defendant "whether he affirms or denies that he has been previously convicted as alleged in the information," and to inform a defendant "that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." Appellant contends that the district court failed to satisfy both requirements. We disagree. Because this issue involves the interpretation and application of legal precepts, our standard of review is plenary. *Dent v. Cunningham*, 786 F.2d 173, 175 (3d Cir.1986).

The district court conducted a very extensive sentencing hearing. Defense counsel freely acknowledged in his address to the court that "Mr. Moskovits was in trouble one prior time." App. at 1934. He also reported to the district court, after conferring with appellant, that "the facts surrounding the Mexican case are really in error, and I'd like to make an attempt to correct them." He further stated that Moskovits "was convicted of one count of illegal introduction of cocaine in Mexico ... in excess of 500 grams." Counsel then explained to the court that "his crime was really possession or introduction of five to ninety-nine grams of cocaine, which is about one-fifth, at least one-fifth of what he was originally charged." App. at 1935–36. The court then stated that Congress requires that "Mr. Moskovits be sentenced on that count to a period of imprisonment of a minimum of ten years." App. at 1942. The government also interrupted defense counsel to inform him, "Because Mr. Moskovits has a prior conviction under narcotic laws of a foreign country, and the government filed an information charging that, there is an enhancement to ten years." To which defense counsel replied, "all right." App. at 1942, 1943. The court then explained to both counsel that "the Mexican conviction is what triggers the raising of the five years to ten years." App. at 1943. Finally, the court informed appellant that "now with respect to the Mexican conviction—I see no ground for concluding that I have authority under Count 8 to impose anything less than ten years ..." Immediately following this statement defense counsel informed the court "I agree with what you just said, Your Honor." App. at 1944, 1945.

Given the events at the sentencing hearing, and the extensive colloquy between the court, the defendant and his counsel, the record establishes that the district court complied with the requirements of 21 U.S.C. § 851(b), and that Mr. Moskovits fully understood how his prior conviction would operate to enhance his sentence. Appellant's argument is without merit.

*United States v. Moskovits*, No. 88–1723, slip opinion at 2–4 (3d Cir. April 13, 1989) [875 F.2d 312 (Table) ] (footnote omitted).

Is Mr. Moskovits foreclosed from pursuing his present claim? I am of the view that he is not. There was nothing addressed at the sentencing hearing in September of 1988, that related to the contentions now made, that the Mexican conviction was invalid in American terms because of lack of counsel at crucial periods of the proceeding. It is the case that Mr. Moskovits expressed his outrage at the proceedings in Mexico. He spoke of inhumane treatment while in custody, and at one point he says, finally, "I understand just the enhancement issue, the conviction in Mexico. If that's so, I can't do anything about that, but I certainly would like Your Honor to put that conviction in quotation marks." *United States v. Moskovits*, No. 87–284–01, sentencing proceeding at 41 (E.D.Pa. Sept. 7, 1988).

But nothing said by Mr. Simone, who was Mr. Moskovits' attorney, challenged the validity of the Mexican conviction; nor indeed did Mr. Simone undertake

to characterize the conviction as one tainted by absence of counsel or otherwise.

In a letter to Mr. Kunstler, dated March 20, 1991, which letter has subsequently been translated into an affidavit, and which I accept as such, Mr. Simone advises Mr. Kunstler in pertinent part:

In answer to your specific question, I do not recall making any effort, and I probably did not make any such efforts, to determine whether the Mexican conviction was valid or not. More than likely, I just assumed it was. Other than that I really do not have a reason for not having gone further with it. In addition, before I entered the case, Alex had two other attorneys, one from San Diego and the other was Thomas Bergstrom, Esquire of Philadelphia.

Also, I used Milton Gruzmark, Esquire of Miami who was supposed to be working on the legal aspects of the case. By the above I do not wish to shift blame since I was his lead counsel. On hindsight, I believe I should have filed some type of motion to contest the validity of the Mexican conviction. Also, my recollection is that Alex made complaints about the case in Mexico concerning his being physically beaten by the authorities.

The non-challenge by Mr. Simone to the Mexican conviction does not, in my judgment, constitute waiver by Mr. Moskovits of the issue here tendered. If we frame the constitutional terms as a substantial one, then, in my judgment, what Mr. Simone acknowledges to have been a failure to do what in hindsight he says he should have done, "filed some type of motion to contest the validity of the Mexican conviction," in the context of a sentencing proceeding where the validity of the Mexican conviction is the key to whether the minimum mandatory sentence is five years or ten years, is a form of ineffective assistance of counsel.

I would conclude that under the very strict standards that are now applicable under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), an attorney has an obligation, that cannot be avoided or delegated to others, to make sure when it comes to sentencing that the ingredients, asserted by the government to be essential ingredients that call for sentence enhancement of a significant nature, are well-founded.

Mr. Simone's failure to pursue that issue by appropriate inquiry into the facts and research in the law, and translation of that inquiry and research into an appropriate motion—a failure which he acknowledges in his letter to Mr. Kunstler—a letter which, as I say, is now an affidavit—is a failure which is not compatible with minimal professional standards.

With that in mind, we turn to the merits of the challenge to the Mexican conviction. I will not undertake to rehearse the full chronology of what happened from Mr. Moskovits' arrest on June 29 through sentence, together with the post-conviction determination on September 29; that the time for appeal from the seven-year sentence which had been imposed had expired. I will not undertake to repeat that chronology in detail.

Suffice it to say, Mr. Moskovits was apprehended at the airport on June 29, 1983, was found by arresting officers to have drugs with him, and was interrogated, made an inculpatory statement, which was signed by Mr. Moskovits. The statement was in Spanish. Mr. Moskovits appended to the margin of the statement on the first page thereof in English the legend, "Under great emotional stress, I admit that this document contains truth."

There were certain preliminary proceedings in July, pursuant to which Mr. Moskovits was held in custody. An attorney, who apparently was not retained, made an appearance on Mr. Moskovits' behalf, but withdrew from the ambiguous representation on August 8.

At that time, Mr. Moskovits was advised by the judge that he, Mr. Moskovits, had three days to retain a new attorney, and failing that, a government attorney would be appointed to represent him. The record does not disclose that any such appointment was in fact made.

The record further discloses that Mr. Moskovits next had legal representation on August 22, when Mr. Moskovits' father and Mr. Herrera, Gilberto Rojo Herrera, entered into a retainer agreement.

There is disagreement between the government and the defendant as to the nature of that retainer agreement. The position taken by Mr. Moskovits is that the purpose of the retainer was solely to secure a fixed sentence which would enable Mr. Moskovits then to be transferred to United States custody under the Prisoner/Exchange Treaty, to which I have referred. Reliance here in placed on clauses three and four of the agreement of retainer.

It is the government's view that the contract of retainer imposes on Mr. Herrera a broader mission; namely that the attorney is to "carry out, within the pertinent legal framework, all the necessary proceedings in order to defend the aforementioned defendant for the purpose of obtaining a minimum sentence when the final decision is handed down in this case."

As a matter of textual construction, there is a plausible argument to be made both ways as to how the document is to be read. I have no extrinsic evidence with respect to the agreement. That is to say, there has been no testimony offered that purports to enlarge on the intended meaning of the text.

The government notes that, on September 15, when Mr. Herrera submitted a written argument on Mr. Moskovits' behalf, he argued to the court that Mr. Moskovits should be "absolved." A petition for absolution would appear to go beyond a petition for a fixed minimum sentence.

The defense position, of course, is that in asking that Mr. Moskovits be absolved, Mr. Herrera was simply doing what any attorney would do to make the strongest possible claim on behalf of his client, and was entirely consistent with a mission whose objective was to get a fixed, albeit minimum, sentence for use in transferring Mr. Moskovits to U.S. custody.

The defense further contends that the lack of an appeal from the seven-year sentence ultimately imposed demonstrates that the mission was completed successfully in the eyes of Mr. Moskovits' father, and presumably Mr. Moskovits, with the rendition of the seven-year sentence.

I don't find it necessary to resolve the dispute with respect to what the purpose of the retainer agreement was, whether the limited one perceived by the defense, or the broader one perceived by the government.

Suffice it to note that, before Mr. Herrera was retained on August 22, there was the first of the two so-called Careo hearings. At those hearings, Mr. Moskovits appeared without counsel present, and confronted his accusers. The understanding is that the Careo proceeding, which has no clear analogue in American jurisprudence, is an opportunity for such a face-to-face presentation.

At the Careo proceeding on August 10, there appears to have been an extended presentation by the arresting officers. Attendant on that, the reception of Mr. Moskovits' statement, the one to which I had referred, which was inculpatory and to which he appended the English notation, that it was signed under emotional stress. Mr. Moskovits had the opportunity, which he evidently exercised, to give testimony himself and to explain the inadequacies and inconsistencies of the arresting officer's testimony, and to represent the inappropriateness of their behavior.

There was a further Careo hearing on August 29, one week after the retention of Mr. Herrera. Mr. Herrera was not present at the August 29 proceeding either. That proceeding was thought to supplement the August 10 proceeding, and to relate to a so-called missing witness. Again, Mr. Moskovits was there, and clearly represented himself with vigor, but he did not have counsel at his side.

With respect to the nature of Careo hearings, the only evidence supplied to this court is contained in affirmation of one Jose Cruz, a Mexican attorney who has status in New York, not as a member of the bar, but as one admitted to advise on

foreign law, that is to say Mexican law. In Mr. Cruz' affirmation, he says:

I am fully familiar with the Mexican law relating to the so-called "Careo" hearings, and I hereby certify that, in accordance with Article 266 of the "Federal Criminal Procedures Code" of Mexico, the only persons who may appear at such hearings are the parties involved, a judge, and an interpreter, if necessary. The attorney for the defense is not allowed to be present since his or her appearance could influence the demeanor of the parties.

"Careo" hearings are not, in themselves, a trial under Mexican law, but only a phase of the procedure which aids the judge in finding the truth. . . .

After the "Careo" hearing, the judge's impression of the said hearing will be just another piece of evidence but this, by itself, may not direct a resolution of the case in one direction or another, since the "Careo" is not a piece of evidence determinative of the resolution of the case.

The discussion by Mr. Cruz is a very modest one. Perhaps it poses more questions than it answers. It is, however, the only information which has been presented either by the government or by the defense. This was a defense submission. There has been earnest argument about how central the Careo hearings are in Mexican criminal procedure.

With respect to the particulars of the process as it affected Mr. Moskovits—that, of course, is the focus of our interest here today—it appears that after the second Careo hearing, on September 6, there was a ruling by the court—and it does not appear whether this was done in a courtroom proceeding or was simply an order—that recited that the parties were free to submit such further evidence as they thought appropriate, but that no such submissions were made.

On September 15, the first proceeding in which it appears as a matter of record that Mr. Herrera participated in some formal sense, was Mr. Herrera's submission to the court, responsive to a motion for judgment that was filed by the Office of the Attorney General on September 13. My recollection is that on September 13, the Attorney General's office had moved for judgment, and Mr. Herrera's submission on the 15th was evidently responsive to that motion.

Suffice it to say, that on September 20, the court made an extended review of the prior proceedings, and, in particular, considered the material brought forward at the Careo proceedings with respect to Mr. Moskovits' apprehension, statements which Mr. Moskovits had reportedly made, and the contention made by Mr. Herrera on Mr. Moskovits' behalf that Mr. Moskovits should be "absolved," a contention which the court rejected in favor of finding Mr. Moskovits guilty.

With respect to sentence, the court concluded that for this defendant, who had no prior criminal record, a seven-year sentence would suffice. And so sentence was imposed.

As I have previously noted, nine days later, a court determined that appeal time had run. Neither the government nor the defense had appealed, and so the seven-year sentence was final and was to be executed.

The record in the Mexican court, as described, calls on us, in my judgment, to return once again to the question already adumbrated, what is the role of the Careo proceeding in Mexican law. As noted, the proceeding was bifurcated. Most of it took place on August 10, a supplementary phase on August 29.

Mr. Moskovits did not have an attorney, at either phase, present at the proceeding. At the time of the supplementary phase, he or his father, on his behalf, had retained an attorney. As of the principal hearing on August 10, Mr. Moskovits had no attorney; that is to say, the attorney who had some ambiguous role in the case earlier, also named Herrera, had withdrawn as of August 8, and the judge had directed that an appointment would be made on Mr. Moskovits' behalf, if Mr. Moskovits did not retain an attorney on his own efforts within three days.

Mr. Moskovits requested the appointment of an attorney on August 10, but it appears that none was made. Though, to be sure, the court had, on August 8, said something about the first Mr. Herrera's continuing obligation, there was nothing to suggest that he pursued those obligations or indeed he had initially done anything on Mr. Moskovits' behalf.

What we have then is two days of Careo proceedings, which appear to be the only proceedings at which live testimony was offered, at which there was an opportunity for cross-examination, and on neither of those days was Mr. Moskovits attended by counsel. Evidently, the government also was not represented by counsel in these proceedings.

The government of the United States contends that in this 2255 action, that it would be a mistake to equate the Careo proceedings with those crucial phases of an American criminal proceeding at which evidence is adduced. The better analogy, it is argued, is that these are in the nature of preliminary proceedings akin to a probable cause hearing. Defense, for its part, contends that certain preliminary hearings, having taken place in July in Mr. Moskovits' case, would better carry the legend of probable cause proceedings.

I find more than a little difficulty accepting the view that the Careo proceedings are to be regarded as preliminary proceedings analogous to the probable cause phase in our jurisprudence. If one takes that nomenclature, one then asks, preliminary to what? Where is the central evidentiary proceeding that in our terms would be a trial?

The government's view is that such an opportunity for presentation of the defense case, if there would be one, was, at least in this instance, made judicially available on September 6, when the court ruled that the parties had the opportunity to offer evidence as they respectably felt appropriate, and then when no such submissions were made, determined that the record was closed.

In so arguing, the government is, of course, relying on the fact that Mr. Moskovits, starting on August 22, had an attorney, and hence the attorney presumably had the opportunity to make such submission on Mr. Moskovits' behalf on September 6. That is a submission of an evidentiary nature as he thought appropriate and felt necessary to do so.

As to the non-aggressiveness of Mr. Herrera on September 6, one may interpret that in either of two ways, depending on whether one accepts the defense's position, that Mr. Herrera's admission was simply to hurry things along to get a finite sentence, or one accepts the government's position, that Mr. Herrera's obligation was to do everything that could be done to protect Mr. Moskovits, including, as Mr. Herrera prayed on September 16 in that submission to the court, to get a sentence absolving Mr. Moskovits.

Whatever construction one may put on the non-events of September 6, the fact is that no submission was made, and so the evidentiary record, on the basis of which the court found guilt and imposed sentence on September 20, was the evidentiary record made at the Careo hearings.

The first question then to be considered is whether, if we take that the proceedings in Mr. Moskovits' case were in accord with standard Mexican criminal procedure, that makes the resultant conviction and sentence secure as a basis for sentence enhancement in our court.

There is nothing before this court to suggest that the procedures utilized in Mr. Moskovits' case departed from Mexican requirements. So I will assume for purposes of discussion that they were in conformity with—at least then—prevailing Mexican requirements.

It is the position, of course, of the defense that Mexican requirements are irrelevant because they fail to guarantee the American constitutional norms; irrelevant, that is to say, insofar as the Mexican conviction is relied on in the United States court for sentence enhancement purposes.

The government's position is that so long as there was conformity with Mexican requirements and with norms of fundamental

fairness, the Mexican conviction and sentence can be relied upon by this court for its sentence enhancement purposes.

Accepting the government's position means that we should test a foreign conviction not by its conformity with every ingredient of what in American terms is fundamental criminal procedure, but we should test a foreign conviction by its conformity with those particular norms of American criminal procedures, jurisprudence constitutionalized, that are the particular domain of absolute rock bottom fundamental fairness.

How does one draw distinctions? In *United States v. Wilson*, 556 F.2d 1177, 1178 (4th Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 481 (1977), the Court of Appeals noted that a German criminal conviction could be relied upon by an American court, notwithstanding the absence of a jury in German criminal procedure. A jury is part of the American constitutional armament. It is guaranteed in federal prosecution by the Bill of Rights, and has been judicially found, via the Fourteenth Amendment, to be an ingredient of the due process which states are required to observe in state criminal proceedings.

It would, however, be a form of cultural imperialism for the United States to insist that it would not countenance, for U.S. purposes, recognition of a foreign criminal judgment which came from a legal culture which did not employ the jury. I don't doubt Congress' authority to say that the jury is *so* important that it wouldn't permit, in looking at foreign criminal judgments for sentence enhancement purposes, reliance on a criminal conviction emanating from Germany or France. But it would seem to me an improbable way to accomplish legitimate American goals of insisting on fairness in American courts. In contradistinction to the jury ingredient, I would find the presence or absence of counsel.

The Supreme Court of the United States found that counsel are required in state criminal proceedings by virtue of the Constitution of the United States, long before the Supreme Court found that juries were required in state criminal proceedings by the Constitution of the United States.

The distinction is not merely a chronological one in the development of the American jurisprudence. The distinction has to do with the basis on which the right to counsel cases lie. The distinction is that without an attorney at one's side, most laypersons are essentially helpless to meet criminal charges.

So that what is in form a hearing, is in fact not a hearing when an accused does not have a lawyer. That observation about how the criminal process works is an observation that would not have geographical boundaries, if the Supreme Court were right in its perception about the criminal process in the United States. The determination is one that would seem to me to apply equally well to Mexico or to the United Kingdom or to South Africa or to the Soviet Union or to Zimbabwe.

Accordingly, I think we cannot countenance reliance on a foreign criminal conviction where it can be said, on the basis of the record made, that there was a failure to provide for counsel at crucial stages of the process. That is a conclusion which, in the first instance, I would determine as a matter of statutory implication. I read the statute that Congress passed, which imposes a ten-year minimum via sentence enhancement in reliance on foreign drug convictions, as a statute which implies that the foreign conviction shall be one which meets norms of fundamental fairness as perceived by United States courts. The participation of counsel at crucial stages of the criminal proceeding is one such fundamental norm.

I say I come to that conclusion as a matter of statutory construction because I would attribute to Congress no lower standard. But I would add that if one could suppose the possibility that Congress had not imported such a requirement into the statute, there would be very grave questions as to the constitutionality of that aspect of the sentencing enhancement provision.

In Mr. Moskovits' case, it is plain that he did not have counsel at the August 10

phase of the Careo proceeding. That is to say, he did not have counsel with him, nor was there an attorney either appointed or retained to represent him. The August 10 proceeding was the one at which the bulk of the evidence was reviewed and relied on by the judge on September 20, as adduced.

By August 29, the supplementary Careo proceeding, Mr. Moskovits had an attorney representing him, but the attorney was not present at the supplementary Careo proceeding.

If we are to follow Mr. Cruz' analysis of Mexican law—and this record gives me no basis for reliance on anything else—Mr. Herrera could not have been present at the August 29 proceeding, even had he wished to do so. It is the case that Mr. Herrera took no steps that are shown by the record to offer supplementary testimony, that is to say, to pursue the opportunity afforded on September 6th. It is also the case that Mr. Herrera did make a written submission on September 15, and was present in person when judgment was announced on September 20.

I cannot find those belated and marginal activities of counsel sufficient to cure the absence of counsel of August 10, or again on August 29. The requirement which the Supreme Court of our country has found to be a central dimension of American criminal procedure is the presence of counsel at all significant stages of the criminal proceeding. And certainly the Careo proceedings, as they related to Mr. Moskovits' prosecution, can only be characterized as crucial. My understanding is that the Supreme Court calls for the presence of counsel at all significant stages in the American criminal proceeding, and what analysis we can make of the Mexican procedures, as they affected Mr. Moskovits, would show the Careo hearings to have been crucial.

Accordingly, I conclude that the Mexican procedures, resulting in a conviction and sentence of Mr. Moskovits, cannot be regarded as a valid conviction and sentence from the perspective of a United States court.

What is the legal implication of that for this case? The Supreme Court of the Unit-

ed States determined in *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) that where it was shown that a sentencing judge had relied on criminal convictions, prior criminal convictions, when he was engaged in the sentencing process, and that two of the criminal convictions relied on were invalid for lack of counsel, it was appropriate to remand the case for resentencing.

The Supreme Court did not say that the sentencing judge was precluded from considering the tainted criminal proceedings. What the Supreme Court appeared to be saying, through Justice Stewart, and the dissent of Justice Blackmun and Chief Justice Burger, was that if there was ground for supposing that the sentencing judge was operating on the understanding that these were valid convictions, and that had he known they were not valid convictions, he might have arrived at a different sentence, then a remand for resentencing was appropriate.

The *Tucker* case was followed by *United States v. Fleishman*, 684 F.2d 1329, 1346 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982), in which the Court of Appeals declined to remand for resentencing. In *Fleishman*, the court found that three appellants had been sentenced with reliance on convictions which were uncounseled. One of the three appellants had expressly waived any challenge to any counsel conviction. As to the other two appellants, the *Fleishman* court concluded that resentencing was not called for because the sentencing judge had relied on the uncounseled convictions, not because he thought the convictions *per se* were necessarily valid—the representation that they were uncounseled were made to the judge—but because he thought they reflected prior criminal behavior which he could properly take into account.

That means, in effect, that the question of whether the invalid prior conviction taints the sentence depends on what light the sentencing judge gained from the prior convictions. If it was the conviction *qua* conviction that the sentencing judge looked to, and in that sense relied upon the validi-

ty of the conviction under U.S. constitutional norm, then a post-sentence determination that the relied on convictions were invalid would call for resentencing.

If, however, the relied on convictions were simply evidentiary of a pattern of antisocial behavior, which to the sentencing judge was relevant to present sentence, then resentencing would not be called for. And so one must look to what the sentencing judge had in mind.

In this case, that inquiry is not a difficult one to make. In this case, the sentencing judge explained on the record that the prior conviction of September 20, 1983, required the sentencing judge to impose a minimum sentence of ten years on Count 8. The sentencing judge, when presented with no reason not to accept that judgment, sentenced accordingly. The sentencing judge was operating under a statutory mandate. He was not exercising his discretion one way or another with respect to whether the Mexican proceedings showed Mr. Moskovits to have been a miscreant a number of years before.

Accordingly, since in this case the sentencing judge was relying on the legal verity, the constitutional integrity in American fundamental fairness terms, of the Mexican conviction, the determination made in this 2255 proceeding that the Mexican conviction cannot properly be relied on because it does not comport with fundamental fairness, would appear to require that the sentence imposed be reconsidered.

The result arrived at in this case is in no sense a technical correction of the past. The absence of counsel in the Mexican proceedings mean, in effect, that Mr. Moskovits was left to his own devices to combat a case against him which consisted not only of testimony of arresting officers, but of an extended and inculpatory statement of his own, which he had undertaken by marginal notation in English to challenge as one obtained under coercive circumstances under what he regarded as emotional stress.

Whether that be a correct characterization or not of the inculpatory statement is something that certainly cannot be deter-

mined on this record, nor is this the proper venue for such an inquiry. The proper venue for such an inquiry was before the Mexican court, where a vigilant and enterprising lawyer would have attacked that element, and any other elements of the prosecution case that might be vulnerable.

One more issue should be addressed, however, before we determine whether resentencing is called for. The government has advised the court, in argument today, that in conversation yesterday with Mr. Herrera—Mr. Moskovits' retained lawyer back in 1983—the government counsel was informed by Mr. Herrera that he, Mr. Herrera, has been retained to initiate a proceeding before what was described as the Human Rights Division of some relevant aspect of the Mexican government, perhaps the Ministry of Justice.

The report, at all events, is, in substance, that Mr. Herrera is initiating, or will shortly be initiating, a challenge to Mr. Moskovits' conviction before the appropriate Mexican tribunal, and that proceeding may take a number of months. The government suggests that success by Mr. Herrera in that collateral attack on Mr. Moskovits' conviction might provide the defense with a firmer ground for coming back to this court to pursue the 2255 challenge.

The defense, for its own reasons, did not undertake to pursue, whether by confirmation or denial, the report by government counsel of the pending, or at least proposed, collateral attack in Mexico. The defense views any such proceeding as irrelevant to our immediate purposes.

I agree. The Mexican proceeding is one that we need not wait on, since a negative determination by the Mexican authorities—that is to say a determination that Mr. Moskovits' proceeding conformed with minimum Mexican standards—would still not bring it into compliance with the American constitutional norms to which I have referred.

One might add, conversely, that an affirmative declaration in 1991 or 1992, that Mexico did not look with favor on the way Mexican criminal process had operated in

1983, would not by itself mean that the Mexican proceeding was invalid in American terms. The determination of conformity with American constitutional standards will have to be made here in this court. The revision by the Mexican legal authorities, desirable as it may be, if it looks to an upward movement in Mexican human rights standards, is not something that should be depended upon dispositively either way for our purposes.

Accordingly, I will direct that Mr. Moskovits' sentence will be vacated, and we will schedule a new sentencing date.